ORIGINAL

1 | Janice P. Brown, Esq. (114433)
Nadia P. Bermudez, Esq. (216555)
2 | Marissa L. Dragoo, Esq. (244480)
**BROWN LAW GROUP**
3 | 600 B Street, Suite 1650
San Diego, CA 92101
4 | Telephone: (619) 330-1700
Facsimile: (619) 330-1701
5 |
Attorneys for Defendants Inverness Medical Innovations, Inc.;
6 | Innovations Research, LLC and David Scott

FILED

08 APR 10 PM 3: 46

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10                                          '08 CV 0653 WQH AJB

11 | VICTOR MANNEH,                    ) Case No.
                                      )
12 |     Plaintiff,                    )
                                      ) DEFENDANTS INVERNESS MEDICAL
13 | v.                                ) INNOVATIONS, INC., INNOVATIONS
                                      ) RESEARCH, LLC AND DAVID SCOTT'S
14 | INVERNESS MEDICAL INNOVATIONS,    ) NOTICE OF REMOVAL
    INC., a Delaware corporation;      )
15 | INNOVATIONS RESEARCH, LLC, a      )
    Delaware limited liability company; DAVID )
16 | SCOTT, and DOES 1 through 50,     )
                                      )
17 |     Defendants.                   )
                                      )
18                                     )
   _____)
19

20        TO THE CLERK OF THE ABOVE-ENTITLED COURT:

21        PLEASE TAKE NOTICE that pursuant to 28 U.S.C. § 1446, Defendants Inverness

22 Medical Innovations, Inc. ("Inverness"), Innovations Research, LLC ("Innovations") and David

23 Scott ("Scott"), hereby invoke this Court's jurisdiction under 28 U.S.C. §§ 1331 and 1441, and

24 state the following grounds for removal:

25 1.    On or about February 27, 2008, an action was commenced by Plaintiff Victor Manneh

26 ("Plaintiff" or "Manneh") in the Superior Court of the State of California in and for the County

27 of San Diego, Central Division, entitled *Manneh v. Inverness Medical Innovations, Inc., et.al.*,

28 case number 37-2008-00078829-CU-BC-CTL ("State Action"). A true and correct copy of the

Summons and Complaint is attached hereto as Exhibit A.

2.      On or about March 13, 2008, Inverness was served with a copy of the Summons and Complaint in the State Action.  A true and correct copy of the Proof of Service is attached hereto as Exhibit B.  This is the only process, pleading, or order that has been served upon Inverness in the State Action to date.

3.      On or about March 11, 2008, Innovations was served with a copy of the Summons and Complaint in the State Action.  A true and correct copy of the Proof of Service is attached hereto as Exhibit C.  This is the only process, pleading, or order that has been served upon Innovations in the State Action to date.

4.      On or about March 20, 2008, service of the Summons and Complaint in the State Action was accepted for Scott, a resident of England.  A true and correct copy of the Proof of Service is attached hereto as Exhibit D.  This is the only process, pleading, or order that has been served upon Scott in the State Action to date.

5.      On or about April 9, 2008 an Answer to the Summons and Complaint was filed in the State Action with the Superior Court of the State of California in the County of San Diego, Central Division.  A true and correct copy of the Answer is attached hereto as Exhibit E.

6.      There are no pending cases related to the State Action.

7.      Defendants are informed that Plaintiff is a citizen of the state of California.

8.      Inverness is a corporation, duly formed and incorporated under the laws of the state of Delaware, with its principal place of business in Waltham, Massachusetts.

9.      Innovations is a limited liability company, duly formed and organized under the laws of the state of Delaware.  Innovations is no longer an operating company, however their address for notice purposes is 4106 Sorrento Valley Boulevard, San Diego, California 92121.

10.     This action is a civil action of which this Court has original jurisdiction pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds seventy five thousand dollars ($75,000) and it involves citizens of different states.

11.     This action is removable to this Court pursuant to 28 U.S.C. § 1441(b) in that the amount in controversy exceeds seventy five thousand dollars ($75,000) and there is diversity of

-2-

1   citizenship between the parties to this action.

2   12.    This Notice of Removal is filed with this Court within thirty (30) days of Defendants

3   Innovations and Inverness' receipt of a copy of the initial pleading setting forth Plaintiff's claim

4   for relief in this action as required by 28 U.S.C. § 1446(b).

5   13.    Defendants Innovations and Inverness submit this Notice of Removal without waiving

6   any defenses to the claims asserted by Plaintiff or conceding that Plaintiff has pled claims upon

7   which relief can be granted.

8   14.    Said State court from which this action was removed and in which this action was

9   commenced is within this Court's district and division.

10   15.    Notice of Filing Notice of Removal will be filed promptly with the Clerk of Court for San

11   Diego County, California, and served on all adverse parties to this action, as required by 28

12   U.S.C. § 1446(d).

13   16.    There are no other defendants in the State Action to join in this Notice of Removal.

14

15   Dated: April 10, 2008                BROWN LAW GROUP

16

17                           By:_____

18                           Janice P. Brown

19                           Nadia P. Bermudez
                              Marissa L. Dragoo

20                           **Attorneys for Defendants Defendants**
                           **Inverness Medical Innovations, Inc.,**
                           **Innovations Research, LLC and David Scott**

21

22

23

24

25

26

27

28

-3-

EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
INVERNESS MEDICAL INNOVATIONS, INC., a Delaware
corporation, INNOVATIONS RESEARCH, LLC, a Delaware
limited liability company, DAVID SCOTT, and DOES 1
through 50

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTA DEMANDANDO EL DEMANDANTE):*
VICTOR MANNEH

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)
CIVIL BUSINESS OFFICE 5

2008 FEB 27 P 3 51

CLERK SUPERIOR COURT
COUNTY, CA

You have **30 CALENDAR DAYS** after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| *(El nombre y dirección de la corte es):* | *(Número del Caso):* |
| San Diego Superior Court | 37-2008-00078829-CU-BC-CTL |
| 330 West Broadway | |

San Diego, CA 92101
Central Court

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
James C. Mitchell (CBA #87151)          619.702.8623     Fx.619.702.6337
Mitchell & Gilleon
402 West Broadway, Ste. 880
San Diego, CA 92101                                       J. ARGUET

| DATE: | FEB 27 2008 | Clerk, by | | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED: You are served**

[SEAL]

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [X] on behalf of *(specify):* *Innovations Research, LLC, A Delaware Limited Liability Company*

   under: [X] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
          [ ] other *(specify)*

4. [ ] by personal delivery on *(date):*

Page 1 of 1

SUMMONS

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

Exhibit **A** Page 4

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| James C. Mitchell (CBA #87151)<br>Daniel M. Gilleon (CBA #195200)<br>Mitchell & Gilleon<br>402 W. Broadway, Suite 880<br>San Diego, CA 92101<br>TELEPHONE NO.: 619.702.8623   FAX NO.: 619.702.6337<br>ATTORNEY FOR (Name): Plaintiff Victor Manneh | FILED<br>BUSINESS OFFICE 5<br>CIVIL<br>FEB 27 1 P 3: 51<br>SUPERIOR COURT<br>COUNTY, CA |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS: P.O. Box 1018
CITY AND ZIP CODE: San Diego, CA 92112-0128
BRANCH NAME: Central

| CASE NAME: Manneh v. Inverness Medical Innovations |

| CIVIL CASE COVER SHEET<br>[X] Unlimited     [ ] Limited<br>(Amount          (Amount<br>demanded       demanded is<br>exceeds $25,000)  $25,000 or less) | Complex Case Designation<br>[ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>37-2008-00078829-CU-BC-CTL |
|---|---|---|
| | | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22) | [X] Breach of contract/warranty (06) | (Cal. Rules of Court, rules 3.400–3.403) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint (not specified above) (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Petition re: arbitration award (11) | [ ] Other petition (not specified above) (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties     d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel  e. [ ] Coordination with related actions pending in one or more courts
          issues that will be time-consuming to resolve            in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence       f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought (check all that apply): a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action (specify): 8
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: February 25, 2008
James C. Mitchell (CBA #87151)
(TYPE OR PRINT NAME)                                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET
Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

Exhibit A   Page 5

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS:      330 West Broadway
MAILING ADDRESS:     330 West Broadway
CITY AND ZIP CODE:   San Diego, CA 92101
BRANCH NAME:         Central
TELEPHONE NUMBER:    (619) 685-6028

PLAINTIFF(S) / PETITIONER(S):    Victor Manneh

DEFENDANT(S) / RESPONDENT(S):  Inverness Medical Innovations, Inc. et.al.

MANNEH VS. INVERNESS MEDICAL INNOVATIONS, INC.

| NOTICE OF CASE ASSIGNMENT | CASE NUMBER: |
| --- | --- |
| | 37-2008-00070829-CU-BC-CTL |

Judge: William R. Nevitt, Jr.                                    Department: C-64

COMPLAINT/PETITION FILED: 02/27/2008

### CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

COMPLAINTS: Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

DEFAULT: If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

Exhibit ___A___ Page 6

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CASE NUMBER: 37-2008-00078829-CU-BC-CTL    CASE TITLE: Manneh vs. Inverness Medical Innovations, Inc.

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Alternative Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.1.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial.

## ADR OPTIONS

**1) CIVIL MEDIATION PROGRAM:** The San Diego Superior Court Civil Mediation Program is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participant in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non-binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for county-referred mediation: $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

**2) JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court

*Exhibit __A__  Page 7*

3) SETTLEMENT CONFERENCES: The goal of a settlement conference is to assist the parties in their efforts to negotiate a settlement of all or part of the dispute. Parties may, at any time, request a settlement conference before the judge assigned to their case; request another assigned judge or a pro tem to act as settlement officer; or may privately utilize the services of a retired judge. The court may also order a case to a mandatory settlement conference prior to trial before the court's assigned Settlement Conference judge.

4) OTHER VOLUNTARY ADR: Parties may voluntarily stipulate to private ADR options outside the court system including private binding arbitration, private early neutral evaluation or private judging at any time by completing the "Stipulation to Alternative Dispute Resolution Process" which is included in this ADR package. Parties may also utilize mediation services offered by programs that are partially funded by the county's Dispute Resolution Programs Act. These services are available at no cost or on a sliding scale based on need. For a list of approved DRPA providers, please contact the County's DRPA program office at (619) 238-2400.

ADDITIONAL ADR INFORMATION: For more information about the Civil Mediation Program, please contact the Civil Mediation Department at (619) 515-8908. For more information about the Judicial Arbitration Program, please contact the Arbitration Office at (619) 531-3818. For more information about Settlement Conferences, please contact the Independent Calendar department to which your case is assigned. Please note that staff can only discuss ADR options and cannot give legal advice.

*Exhibit A    Page 8*

| | FOR COURT USE ONLY |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO** | |
| STREET ADDRESS: 330 West Broadway | |
| MAILING ADDRESS: 330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827 | |
| BRANCH NAME: Central | |

| PLAINTIFF(S): Victor Menneh |
|---|
| DEFENDANT(S): Inverness Medical Innovations, Inc. et.al. |
| SHORT TITLE: MANNEH VS. INVERNESS MEDICAL INNOVATIONS, INC. |

| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS (CRC 3.221)** | CASE NUMBER: 37-2008-00078829-CU-BC-CTL |
|---|---|

Judge: William R. Nevitt, Jr.                                          Department: C-64

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process. Selection of any of these options will not delay any case management time-lines.

☐ Court-Referred Mediation Program                   ☐ Court-Ordered Nonbinding Arbitration

☐ Private Neutral Evaluation                         ☐ Court-Ordered Binding Arbitration (Stipulated)

☐ Private Mini-Trial                                 ☐ Private Reference to General Referee

☐ Private Summary Jury Trial                         ☐ Private Reference to Judge

☐ Private Settlement Conference with Private Neutral  ☐ Private Binding Arbitration

☐ Other (specify): _____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate: (mediation & arbitration only) _____

Date: _____                       Date: _____

Name of Plaintiff                                    Name of Defendant

_____                            _____

Signature                                            Signature

_____                            _____

Name of Plaintiff's Attorney                         Name of Defendant's Attorney

_____                            _____

Signature                                            Signature

(Attach another sheet if additional names are necessary). It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, 3.1385. Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all un-served, non-appearing or actions by names parties are dismissed.

**IT IS SO ORDERED.**

Dated: 02/27/2008                                    _____
                                                      JUDGE OF THE SUPERIOR COURT

SDSC CIV-359 (Rev 01-07)          **STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION**          Page: 1

3

*Exhibit* **A** ___ *Page* 9

FILED
CIVIL BUSINESS OFFICE 5

1   James C. Mitchell (CBA # 87151)
    Mitchell & Gilleon                          7000 FEB 27  P 3: 51
2   402 West Broadway, Suite 880
    San Diego, CA 92101                          SUPERIOR COURT
3   Tel: 619.702.8623/Fax: 619.702.6337

4   V'Frank Asaro (CBA #32052)
    Law Offices of V'Frank Asaro
5   4370 La Jolla Village Dr., Ste. 400
    San Diego, CA 92122
6   Tel: 858.546.0400/Fax: 858.259.1415

7   Attorneys for Plaintiff Victor Manneh

8          SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
                           (Central Division)
9

10

11  VICTOR MANNEH,                      CASE NO.  37-2008-00078829-CU-BC-CTL

12                  Plaintiff,          COMPLAINT FOR:
                                        1.  Rescission — Fraud;
13       vs.                            2.  Declaratory Relief;
                                        3.  Breach Of Contract;
14  INVERNESS MEDICAL                   4.  Common Count;
    INNOVATIONS, INC., a Delaware       5.  Fraud; and
15  corporation, INNOVATIONS            6.  Interference With Economic
    RESEARCH, LLC, a Delaware               Advantage.
16  limited liability company, DAVID
    SCOTT, and DOES 1 through 50,
17
18                  Defendants.

19       Plaintiff Victor Manneh ("Manneh") alleges:

20                       GENERAL ALLEGATIONS

21       1.     Manneh resides in San Diego County, California.

22       2.     Defendant Inverness Medical Innovations, Inc. is a Delaware

23  corporation that is authorized to and does business in San Diego County,

24  California.

25       3.     Defendant Innovations Research, LLC is a Delaware limited liability

26  company that is authorized to and did business in San Diego County, California.

27  Innovations was formed by and is a subsidiary of Inverness.

28       4.     Defendant David Scott resides in England and, at all material times,

                 Complaint For Rescission — Fraud, etc.

1  was an officer and director of Inverness, as well as a managing member of

2  Innovations.

3      5.    Manneh does not know the names of Does 1 through 50.

4      6.    At all material times, all of the defendants were the agents and

5  employees of the each other and in doing the acts alleged in this complaint were

6  acting within the course and scope of such agency.

7      7.    Manneh is a highly-experienced and prominent research and

8  development scientist in the areas of medicine and pharmacology, in particular,

9  the field of protein blood markers to detect diseases. In September 2002, he

10  resided in San Diego and was employed by Accumetrics. He was looking for other

11  employment. At that time, Inverness, Scott and Does 1 through 50, through an

12  executive search company employed by Inverness and Does 1 through 50,

13  recruited Manneh to come to work at Inverness and Does 1 through 50 as a

14  research and development scientist in Bedford, England to lead the company's

15  new team that was to develop a handheld cardiology meter.

16      8.    At this same time, Manneh was being recruited to work at other

17  companies and had several lucrative job offers. Manneh dealt directly with Scott

18  and Does 1 through 50 about a job with Inverness; he explained to them that he

19  had other job offers and was reluctant to leave San Diego unless Inverness'

20  compensation package included substantial options to purchase the company's

21  stock. Scott and Does 1 through 50 promised the package would and it did.

22      9.    A true and correct copy of the October 2, 2002 employment contract

23  between Manneh and Inverness, that he negotiated with Scott, is attached as

24  Exhibit 1. In reliance on the contract, Manneh gave up other employment

25  opportunities, quit his job at Accumetrics, moved to England and went to work for

26  Inverness and Does 1 through 50, effective November 19, 2002. He was employed

27  as a research and development scientist working at a division or subsidiary of

28  Inverness and Does 1 through 50 called Unipath Limited as the project leader for

Complaint For Rescission -- Fraud, etc.

2.

1    the company's team that was developing a handheld cardiology meter.

2        10.    One of the terms of the employment contract that, as explained

3    above, was a major inducement to Manneh taking the job with Inverness and

4    Does 1 through 50 and entering into that contract was a stock option provision

5    with a three-year vesting that stated (Ex. 1, pp. 1, 2 Remuneration):

6            "Options: You [Manneh] will be entitled to a total

7            of 30,000 options to purchase common stock of the
        Company [Inverness] under the Company's 2001

8            Stock Option and Incentive Plan (the "Option
        Plan"), vesting yearly in equal installments of

9            10,000 options on the anniversary on the date of
        issue. These options will be issued on the date of

10           commencement of your employment with the
        Company [November 19, 2002]."

11       11.    After Manneh relocated to England, Inverness, Scott and Does 1

12   through 50 provided Manneh with a stock option agreement that called for 30,000

13   shares of stock vesting over a four-year period at 7,500 shares per year, rather than

14   what the employment contract provided, 30,000 shares vesting at 10,000 per year

15   over a three-year period. Manneh first talked with two other Inverness officers

16   and directors, Jerry McAleer and Paul Hempel, about this discrepancy. He told

17   them his employment contract called for a three-year, not a four-year vesting.

18   McAleer told Manneh, Inverness does not give three-year vestings on stock

19   options.

20       12.    On January 15, 2003, Manneh talked to Scott about the difference.

21   Scott told him he made a mistake when he agreed to the three-year vesting for the

22   stock options, and, he restated what McAleer had told Manneh, that a three-year

23   vesting was against Inverness' company policy. Manneh asked Scott, "How are

24   we going to fix this?" Scott replied, sign the stock option agreement and I (Scott)

25   will find a way to fix my mistake, if it becomes a problem later. In reliance on this

26   representation, Manneh signed the stock option agreement (with the incorrect

27   four-year vesting) a true and correct copy of which is attached as Exhibit 2.

28       13.    Around August 2003, Manneh had to return, temporarily, to San

Complaint For Rescission — Fraud, etc.

3

1  Diego for personal reasons. He continued to work for Inverness from an office

2  of an Inverness affiliate in San Diego, ABI. Inverness and Does 1 through 50 had,

3  by that time, acquired other business interests in San Diego and, through

4  discussions with Manneh, had decided to relocate part of its research and

5  development activities to this area.

6       14.   Manneh and Inverness and Does 1 through 50, through discussions

7  between Scott and Manneh, agreed Manneh would start, staff and manage a

8  research and development laboratory in San Diego for Inverness and Does 1

9  through 50 to continue the work on the cardiology meter project. Inverness and

10  Does 1 through 50 formed Innovations on January 30, 2004 as an Inverness

11  subsidiary to own and operate the new San Diego research and development

12  laboratory at 4106 Sorrento Valley Road, San Diego (the "San Diego Laboratory").

13       15.   Manneh hired four scientists as Inverness and Innovations

14  employees to staff the new San Diego Laboratory, located the office space for the

15  laboratory and arranged for Inverness and/or Innovations to lease the space and

16  purchase the material, equipment, furniture and fixtures, as well as leasehold

17  improvements, necessary to operate the laboratory, which began operating in

18  January 2004.

19       16.   Under Section 11(a)(ii) of Manneh's employment contract with

20  Inverness and Does 1 through 50, these defendants owned "any and all

21  discoveries, designs, inventions, secret processes or improvements and

22  procedures, systems, equipment or services, made, developed, improved upon,

23  written or discovered by you ... subject to your [Manneh's] statutory rights as

24  inventor." Under United States Patent Law, the actual inventor of a design,

25  invention or process, etc. is required by law to be named in the patent application

26  and any patent for such invention. While Manneh was employed by Inverness

27  and Does 1 through 50, he and another Inverness employee, Oliver Davis,

28  invented "Assay Using Magnetic Particles And Moving Such To Detection And

Complaint For Rescission — Fraud, etc.
4

1   Measurement" (The "Assay Invention").

2       17.    Around July 29, 2005, Scott told Manneh that Inverness and Does 1

3   through 50 were consolidating their research and development operations to

4   Stirling, Scotland and would be closing the San Diego Laboratory by October 31,

5   2005. He asked if Manneh and the San Diego team would relocate to Scotland.

6   Manneh replied he could not do this at that time because of family commitments

7   in San Diego. Manneh told Scott he desired to start his own research and

8   development company and wanted to take over the San Diego Laboratory from

9   Inverness, Innovations and Does 1 through 50 and use it to operate the new

10   company. Scott said this might be something Inverness, Innovations and Does

11   1 through 50 would consider and discussions to accomplish this between them

12   and another Inverness employee, Steve Howell, started almost immediately.

13       18.    The defendants knew the process for winding up the San Diego

14   Laboratory by October 31, 2005, would have consumed all of Manneh's and the

15   staff's time, leaving no time for them to complete the research and development

16   they were working on for the cardiology meter project. This work would normally

17   take close to another year to complete. Scott and Does 1 through 50 told Manneh

18   that Inverness and Innovations needed Manneh and the San Diego Laboratory

19   staff to perform extraordinary work beyond the scope of Manneh's employment

20   contract. They were the most qualified Inverness' and Innovations' employees

21   with the resources, expertise and technical capability to manufacture certain

22   chemical "reagents" essential to Inverness' and Does 1's through 50's continuing

23   and timely development of the cardiology meter project. The defendants knew

24   this. Scott, Howell, Inverness, Innovations and Does 1 through 50 asked Manneh

25   to complete the work in about three months, by October 31, 2005.

26       19.    From August 8 through September 12, 2005, through discussions with

27   Scott and Howell, another Inverness officer or managing agent, Manneh and

28   Inverness, Innovations and Does 1 through 50 entered into a new verbal contract.

1    The agreement was for Manneh and the San Diego Laboratory staff to perform the
2    extraordinary work of winding up the laboratory by October 31 and, in addition,
3    they would manufacture and deliver the reagents required for the cardiology
4    meter project to Scotland by October 31, 2005, something Scott, Howell and Does
5    1 through 50 agreed were "milestones" to be met by him. In return for performing
6    these obligations and meeting the milestones, Scott, Howell and Does 1 through
7    50 agreed that Inverness, Innovations and Does 1 through 50 would transfer all
8    of the laboratory chemicals, materials, equipment and leasehold improvements,
9    except for one instrument (collectively the "Equipment") to Manneh and he was
10   also to assume the lease for the laboratory premises (the "Equipment Agreement").
11   True and correct copies of the meeting minutes memorializing this contract and
12   the emails confirming it are attached as Exhibit 3.
13       20.    Scott, Inverness, Does 1 through 50 and Inverness' general counsel,
14   Anne Warner, promised Manneh the Equipment Agreement would be included
15   as part of a later severance agreement between Manneh and Inverness,
16   Innovations and Does 1 through 50. Warner put this promise in writing in her
17   September 12, 2005 email to Manneh.
18       21.    In reliance on the Equipment Agreement, from mid-August through
19   October 31, 2005, Manneh worked approximately 70 hours per week, weekends
20   included, nearly double the 37.5 hours per week required by the employment
21   contract, to manufacture the reagents so this technology could be delivered to
22   Scotland by October 31, 2005. This additional work also included taking those
23   steps necessary to wind up the San Diego Laboratory operation so he could take
24   it over, as per the Equipment Agreement.
25       22.    Around October 21, 2005, Inverness, Innovations and Does 1 through
26   50 provided Manneh with a draft of the severance agreement between them. A
27   true and correct copy of this draft is attached as Exhibit 4. It did not include the
28   Equipment Agreement. Manneh complained about this to Scott and Warner, who

1  both promised to include it in a new draft of the severance agreement.

2      23.    Manneh fully performed the Equipment Agreement. He met the

3  milestones set by Scott, Howell, Inverness, Innovations and Does 1 through 50

4  and completed manufacturing and delivering the reagents and additional

5  technology to Inverness' Scotland operation on October 25, 2005. Inverness and

6  Does 1 through 50 accepted Manneh's performance of the agreement, his

7  delivering the completed reagents and related technology. These reagents were

8  extremely valuable to Inverness and Does 1 through 50 and were essential to

9  Inverness' and Does 1's through 50's continued timely and seamless process of

10 developing the handheld cardiology meter technology. Inverness, Innovations

11 and Does 1 through 50 praised Manneh for the work and asked if more reagents

12 could be manufactured, both before and after Manneh took over the laboratory

13 and Equipment.

14     24.    Inverness, Innovations and Does 1 through 50 provided Manneh with

15 a new draft of a severance agreement on October 25, 2005 that did not include the

16 Equipment Agreement described in paragraphs 17 through 19, but was contrary

17 to it (stating Inverness and Innovations retained ownership of the Equipment and

18 Manneh, in return, was required to grant them an exclusive no-fee license on all

19 the work he developed for the next three years) and included a general release of

20 claims. A true and correct copy of this draft agreement is attached as Exhibit 5.

21 Manneh complained about this to Scott and Inverness' general counsel, Warner.

22 Both of them then confirmed in emails to Manneh (Scott did so verbally too) that

23 the Equipment and the Equipment Agreement would be removed from, be

24 excluded from any severance agreement and would be dealt with separately. True

25 and correct copies of these emails, and a new draft of the severance agreement,

26 are attached as Exhibit 6. This draft excluded the Equipment and the Equipment

27 Agreement.

28     25.    On November 17, 2005, Manneh told Scott he was still not comfortable

1  signing another severance agreement provided to him that day (Exhibit 7)

2  because he thought the release of claims in it might cover the Equipment and the

3  Equipment Agreement. Scott then represented to Manneh:

4          a.    The Equipment Agreement and the Equipment were not part

5  of the severance agreement (something he and Warner had previously

6  represented to Manneh were items specifically excluded from the agreement) and

7  the release of claims did not apply to the Equipment or the Equipment

8  Agreement;

9          b.    The San Diego Laboratory equipment, materials and leasehold

10  improvements, except for one instrument, were now Manneh's, and for Inverness'

11  and Innovations' tax/depreciation purposes, would be leased back to Manneh for

12  one year with a consideration of one dollar;

13          c.    Manneh should complete making arrangements with the

14  landlord for the laboratory premises for Manneh to pay the rent for December 1,

15  2005 and assume Innovations' lease for the premises, effective December 1;

16          d.    Manneh could move into the laboratory premises when he

17  returned from a planned vacation (starting, Scott knew, the next day, on

18  November 18) at the end of November 2005; and

19          e.    He (Scott) will work out something that would correct the

20  mistake about the three-year versus four-year stock options vesting, where Scott,

21  McAleer and Does 1 through 50 had represented in late 2002 and early 2003 that

22  a three-year vesting was never given by Inverness.

23      Manneh relied on these representations and signed the severance

24  agreement on November 17, 2005 (the "Severance Agreement"). A true and correct

25  copy of the agreement is attached as Exhibit 7.

26      26.    On November 28, 2005, when Manneh returned from vacation, Scott

27  told him to go ahead and move into the laboratory premises by December 1 and

28  pay the December 2005 rent. However, Inverness, Innovations and Does 1

1  through 50 refused to give Manneh the keys to or possession of the premises on
2  December 1, or ever. Manneh later learned, on December 28, 2005, that Inverness,
3  Innovations and Does 1 through 50 were removing the materials and Equipment
4  from the laboratory premises and were closing it.

5         27.    Inverness, Innovations, and Does 1 through 50:

6                a.    Never transferred to Manneh either the keys to or possession
7  of the laboratory premises or the Equipment he had earned under the Equipment
8  Agreement;

9                b.    Have now recently taken the position the release of claims in
10 the Severance Agreement applies to the Equipment and the Equipment
11 Agreement;

12               c.    Have done nothing to correct the mistake about the three-year
13 stock options vesting;

14               d.    Did not name Manneh as the actual inventor of the Assay
15 Invention in their application to the United States Patent Office for a patent on
16 this invention, but named others who did not invent it, something Manneh first
17 learned in mid-December 2005; and

18               e.    After Manneh informed Inverness, Innovations and Does 1
19 through 50 of the omission of his name from the patent application, did nothing
20 to correct the application and name Manneh as the actual inventor of the Assay
21 Invention.

22        28.    By stipulation between the parties, all time-barring periods were
23 tolled from September 10, 2007 to February 29, 2008.

24                          FIRST CAUSE OF ACTION
25      (Rescission Of Severance Agreement - Fraud Against All Defendants)

26        29.    Manneh realleges paragraphs 1 through 28.

27        30.    Inverness, Innovations, Scott and Does 1 through 50 represented to
28 Manneh:

---

Complaint For Rescission — Fraud, etc.
9

1        a.    Inverness did not and had never given to employees three-year

2    vestings for stock options;

3        b.    Inverness, Innovations and Does 1 through 50 would perform

4    the Equipment Agreement;

5        c.    Any employment Severance Agreement between Manneh and

6    Inverness, Innovations and Does 1 through 50 specifically excluded and did not

7    cover either the Equipment or the Equipment Agreement and the release of

8    claims in such a agreement would not apply to the Equipment or the Equipment

9    Agreement;

10        d.    Manneh had fully performed the Equipment Agreement by

11    delivering the reagents to Scotland on time and meeting the milestones set by

12    Scott and Howell;

13        e.    The San Diego Laboratory equipment, materials and leasehold

14    improvements, except for one instrument were Manneh's, as promised under the

15    Equipment Agreement, and for Inverness' and Innovations' tax/appreciation

16    purposes, would be leased back to Manneh for one year at a consideration of one

17    dollar;

18        f.    Manneh could move into the laboratory premises at the end of

19    November 2005;

20        g.    Scott, Inverness and Does 1 through 50 would work out

21    something that would correct the mistake Scott made about the three-year versus

22    four-year stock option vesting; and

23        h.    Manneh's rights as inventor of the Assay Invention would be

24    honored, as required by the employment contract.

25        31.    When Inverness, Innovations, Scott and Does 1 through 50 made the

26    representations, they either knew the representations were false, or did not know

27    if the representations were true or false, or had no reasonable grounds to believe

28    the representations were true.

*Exhibit A    Page  19*

32.    The defendants made the representations to induce Manneh to sign the Severance Agreement.

33.    The representations by Inverness, Innovations, Scott and Does 1 through 50 were false. The true facts were:

a.    Inverness and Does 1 through 50 had given three-year vestings to employees for stock options;

b.    Inverness, Innovations and Does 1 through 50 had no intent to perform the Equipment Agreement or to transfer the Equipment and the laboratory premises to Manneh;

c.    A Severance Agreement, including the one Manneh signed, between Manneh and Inverness, Innovations and Does 1 through 50, was to include a release of claims that did apply to the Equipment and Equipment Agreement;

d.    Inverness, Innovations, Scott and Does 1 through 50 had no intent, at any time, to correct the alleged mistake Scott made concerning the three-year versus four-year vesting on the stock options; and

e.    Manneh was not named as the inventor of the Assay Invention in the patent application.

34.    Manneh relied upon the representations and signed the Severance Agreement. He did not know the representations were false. Had he known the true facts, he would not have signed the Severance Agreement.

35.    This fraud by the defendants is grounds for Manneh to rescind the Severance Agreement. Through this complaint, Manneh requests rescission of the Agreement and offers to return everything of value he received under that agreement in return for Inverness, Innovations and Does 1 through 50 acknowledging the Severance Agreement is cancelled, effective November 17, 2005, and has never been effective.

36.    Scott, Inverness, Innovations and Does 1 through 50 acted with

1  intentional fraud or malice as defined in Civil Code § 3294, which entitles Manneh

2  to punitive damages in an amount appropriate to punish and make an example

3  of such defendants.

### SECOND CAUSE OF ACTION
#### (Declaratory Relief Against Defendants Inverness, Innovations And Does 1 Through 50)

6  37.    Manneh realleges paragraphs 1 through 34.

7  38.    There is a dispute between Manneh and Inverness, Innovations and

8  Does 1 through 50 about the scope and legal effect of the Severance Agreement.

9  39.    Manneh contends the Severance Agreement did not cover the

10 Equipment, the Equipment Agreement, the stock options, or the Assay Invention

11 and that the release of claims in the Severance Agreement does not apply to bar

12 any such claims he has against Inverness, Innovations and Does 1 through 50

13 concerning the Equipment, the Equipment Agreement, the stock options, or the

14 Assay Invention.

15 40.    Inverness, Innovations and Does 1 through 50 contend the release of

16 claims in the Severance Agreement both covers and applies to claims concerning

17 the Equipment, the Equipment Agreement, the stock options and the Assay

18 Invention.

19 41.    Manneh requires a judicial declaration of his rights and duties under

20 the Severance Agreement, that is, the agreement does not cover the Equipment,

21 the Equipment Agreement, the stock options, or the Assay Invention and the

22 release of claims does not bar Manneh's claims against Inverness, Innovations

23 and Does 1 through 50 concerning the Equipment, the Equipment Agreement,

24 the stock options or the Assay Invention.

### THIRD CAUSE OF ACTION
#### (Breach Of Equipment Agreement Against Defendants Inverness, Innovations And Does 1 Through 50)

27 42.    Manneh realleges paragraphs 1 through 28.

28 43.    Manneh has performed every term and condition he was obligated to

1 perform under the Equipment Agreement, except those he was excused from

2 performing.

3    44.    Inverness, Innovations and Does 1 through 50 breached the

4 Equipment Agreement through the acts described in paragraphs 26 and 27.

5    45.    As a legal result and natural consequence of Inverness, Innovations

6 and Does 1 through 50 breaching the Equipment Agreement, Manneh has been

7 damaged as follows:

8        a.    The value of the Equipment, approximately $500,000; and

9        b.    The loss of net profits from Manneh's planned new business,

10 approximately $850,000.

11                    FOURTH CAUSE OF ACTION
        (Common Count - Reasonable Value Of Services Against Defendants
12                Inverness, Innovations and Does 1 Through 50)

13    46.    Manneh realleges paragraphs 1 through 28.

14    47.    Between August 8 and October 31, 2005, at the special request of

15 Inverness, Innovations and Does 1 through 50, Manneh performed extraordinary

16 services for such defendants.  Such defendants agreed to pay Manneh the

17 reasonable value of such services.

18    48.    Since around January 2006, Inverness, Innovations and Does 1

19 through 50 have refused to pay Manneh the reasonable value of the services he

20 provided, approximately $500,000.  This money was then and is now owed to

21 Manneh by such defendants.

22                    FIFTH CAUSE OF ACTION
        (Fraud - Intentional Misrepresentation Against Defendants Inverness,
23                    Scott And Does 1 Through 50)

24    49.    Manneh realleges paragraphs 1 through 28.

25    50.    When Scott, Inverness and Does 1 through 50 represented to Manneh

26 that Inverness and Does 1 through 50 did not grant stock options with a three-year

27 vesting, they either knew this representation was false, or made it recklessly

28 without knowing if the representation was true or false.

51.    Scott, Inverness and Does 1 through 50 made the representation to induce Manneh to sign the stock option agreement (Exhibit 2) with a four-year vesting and to later sign the Severance Agreement.

52.    The true facts were that Inverness and Does 1 through 50 did grant employees stock options with three-year vesting periods, something Manneh just learned for the first time in mid-2007.

53.    When the representations were made, Manneh did not know they were false. He relied on the representations by Scott and Does 1 through 50, and Scott's additional representations he would correct the mistake about the three-year versus four-year vesting for the stock options, and signed the stock option agreement (Ex. 2) and the Severance Agreement. Had Manneh known the true facts, he would not have signed either agreement.

54.    As a legal result of Manneh's reliance on the representations of Scott, Inverness and Does 1 through 50, he has been damaged by the value of the 7,500 shares of stock he did not receive, over the option price for the shares, $10.85 per share, an amount of at least $100,000.

55.    Manneh realleges paragraph 36.

### SIXTH CAUSE OF ACTION
#### (Fraud — Negligent Misrepresentation Against Defendants Inverness, Scott And Does 1 Through 50)

56.    Manneh realleges paragraphs 1 through 28.

57.    When Scott, Inverness and Does 1 through 50 made the representation to Manneh that Inverness did not grant stock options with a three-year vesting, they had no reasonable belief in the truth of this representation.

58.    Manneh realleges paragraphs 51 through 54.

### SEVENTH CAUSE OF ACTION
#### (Breach Of Employment Contract Against Defendants Inverness, Innovations And Does 1 Through 50)

59.    Manneh realleges paragraphs 1 through 28.

Complaint For Rescission — Fraud, etc.
14.

Exhibit *4* Page 23

60. Manneh has performed every term and condition he was obligated to perform under the employment contract between him, Inverness, Innovations and Does 1 through 50, except those he was excused from performing.

61. Inverness, Innovations and Does 1 through 50 breached the employment contract by:

a. Not giving Manneh the option to purchase 7,500 shares of Inverness stock as of October 2005, as required by the contract; and

b. Not naming Manneh as the actual inventor of the Assay Invention in the application for a patent for such invention.

62. As a legal result and natural consequence of Inverness, Innovations and Does 1 through 50 breaching the employment contract, Manneh has been damaged as follows:

a. The value of the 7,500 shares of Inverness stock he did not receive, over the option price for the shares, $10.85 per share, an amount of at least $100,000; and

b. The value to Manneh of his statutory rights as inventor of the Assay Invention, according to proof.

## EIGHTH CAUSE OF ACTION
### (Intentional Interference With Economic Advantage Against Defendants Inverness, Innovations And Does 1 Through 50)

63. Manneh realleges paragraphs 1 through 33.

64. Inverness, Innovations and Does 1 through 50 knew Manneh, after his employment with them, would derive an economic benefit in the future from his statutory right as inventor of the Assay Invention, and from being named as the actual inventor on the patent.

65. Inverness, Innovations and Does 1 through 50 also knew Manneh was going to use the Equipment he earned from performing the Equipment Agreement to operate his new business and create revenue and profits from that business.

1    66.    Through the acts described in paragraphs 24 through 27 and 30
2 through 33, Inverness, Innovations and Does 1 through 50 intentionally interfered
3 with the economic benefits Manneh would have derived from his statutory rights
4 as the inventor of the Assay Invention and from using the Equipment to operate
5 his new business.

6    67.    As a legal result of the wrongful conduct of Inverness, Innovations
7 and Does 1 through 50, Manneh has been damaged by the amount of at least
8 $1,000,000.

9    68.    Manneh realleges paragraph 36.

10                        REQUEST FOR RELIEF

11    THEREFORE, plaintiff Victor Manneh requests a judgment against
12 defendants Inverness Medical Innovations, Inc., Innovations Research, LLC,
13 David Scott and Does 1 through 50 for:

14    a.    General damages of approximately $1,450,000;

15    b.    Punitive damages under the First, Third and Eighth Causes of Action;

16    c.    Rescission of the Severance Agreement;

17    d.    A declaration that the Severance Agreement does not cover and the
18 release of claims in the agreement does not apply to bar claims by Manneh
19 against the defendants concerning, the Equipment Agreement, the stock options
20 or the Assay Invention;

21    e.    Costs of suit and, if allowed by law, reasonable attorney's fees; and

22    f.    Any other proper relief.

23 Date: February 27, 2008                    Mitchell & Gilleon

24

25                                           James C. Mitchell, Attorneys for
                                             Plaintiff Victor Manneh

26                                           Law Offices of V'Frank Asaro

27

28                                           V'Frank Asaro, Attorneys for
                                             Plaintiff Victor Manneh

                    Complaint For Rescission — Fraud, etc.
                                  16

Inverness medical Innovations

Victor Manneh
16016 Via Dicha
Rancho Sante Fe

2nd October 2002

Dear Victor

I have set out below a summary of our discussions for your employment by Inverness Medical
Innovations Inc. ("The Company") and I would like to finalize an offer of employment with this
letter. This letter is deemed to be a Statement and Note of Particulars of Employment as required
by Section 1 of the Employment Rights Act 1996 with respect to the time you are actively
employed in the United Kingdom.

<u>Job Titles</u>

1. Project Leader responsible for product launch.
2. Specific job functions agreed to between you and the Company from time to time

You will be employed by Unipath Limited and it is expected that you will relocate to the
UK. This relocation is conditional upon the Company being able to secure the
appropriate work permits for you to work in the UK. The Company will use its best
endeavors to obtain the necessary work permits to facilitate working in the UK. You will
be expected to work at the Company's facilities in Bedford, UK.

<u>Remuneration:</u>

- Annual Base Salary: 140,000 USD. Your commencing base salary will be 140,000
  USD per annum. The salary (less tax and statutory deductions and such other
  deductions (if any) as you may authorize from time to time) shall be payable to you
  monthly in arrears on or before the last day of each month by direct transfer into a
  bank account nominated by you and shall be deemed to accrue on a daily basis.
  Salaries are reviewed annually, but the Company maintains a policy of monitoring
  salary levels at all times. You have the option to have your salary grossed up to meet
  140,000 USD net US salary using regular tax rules USD to provide tax equalization.
  This option will be available providing you are located on a majority time basis in the
  UK.

- Bonus: You will not be eligible for a variable pay bonus unless an executive
  management wide bonus scheme is introduced.

- Options: You will be entitled to a total of 30,000 options to purchase common stock
  of the Company under the Company's 2001 Stock Option and Incentive Plan (the
  "Option Plan"), vesting yearly in 3 equal installments of 10,000 options on the
  anniversary of the date of issue. These options will be issued on the date of
  commencement of your employment with the company. The options will be
  qualified Incentive Stock Options to the extent permitted by law. The exercise price
  for these Options will be determined by the closing price at the day of issue, which
  will be the date on which your employment with the company commences. In
  addition, you will be eligible to participate in any future option grants available for

Inverness medical Innovations

Inverness Medical Innovations Inc and Unipath Limited employees commensurate with your position.

- **Stock Purchase Plan:** You will be eligible to participate in any Employee Stock Purchase Plan upon employment with Inverness Medical Innovations in accordance with its standard provisions and terms, as may be offered by the company.

- **Relocation:** You will be eligible for relocation allowance up to 15,000 USD as per the company's relocation guidelines. The relocation allowance is applicable to expenses incurred in your relocation in the first instance and your immediate family's relocation at any time during three years. In addition you will be entitled to receive a total of 5 round trips to the USA, coach class tickets per year for up to three years for your use or your immediate family's use.

2.  **Working Hours:**

    Your normal working hours shall be 37.5 hours per week, Monday to Friday with a ½ hour for lunch, but you may be expected to work additional hours as required by the Company and you are required to be flexible in the hours that you work.

3.  **Term and Notice Period:**

    - **Start Date.** Your start date for employment will be mutually agreed. You are expected to re-locate to the UK and work there permanently once the company has obtained a work permit.
    - **Term.** Your appointment to this position is not subject to any term.
    - **Probationary Period.** Your appointment is subject to a probationary period of three months.
    - **Notice without Cause.** Until you have completed four years' continuous service, either you or the Company must be given three month's written notice by the party wishing to terminate the contract. Thereafter, you are entitled to receive one week's notice for each additional complete year's service up to a maximum of 12 weeks additional notice. By mutual agreement, these notice periods can be waived by either party. At the discretion of the employer, a payment in lieu of notice may be given. The Company reserves the right to suspend your duties during any period of notice. Throughout any such period of suspension your salary and benefits to which you are entitled under this Agreement shall continue to be paid or provided by the Company. During any period of suspension you will remain bound by all your obligations to the Company or any one of the associated Parent or subsidiaries of the Company ("Group Company") under this Agreement.
    - **Notice without cause after change of control.** In the event you are terminated without cause after a change of control you will receive one-year base salary. Upon a change of control, all unvested Inverness Medical Innovations, Inc. will fully vest immediately and be exercisable under the Option Plan, as more specifically set out in the Option Plan. You will also be eligible for reasonable outplacement services paid for by the Company, not to exceed 15,000 USD.
    - **Termination for Cause.** The Company reserves the right to terminate employment without notice in the event of serious misconduct or breach of contract. No salary or



Inverness medical innovations

benefits shall be paid to you after the notice period except as specifically provided for herein for repatriation.

4.    Sickness:

Copies of the Company procedures on payment during absence and notification of absence to are attached hereto. While the Company maintains a general sickness payment policy to eliminate loss of earnings during absence due to sickness or injury any payments made to you in respect of such periods of absence by the Company, other than statutory sick pay, are made entirely at the discretion of the Company. Any such payments will include, and not be in addition to, statutory sick pay. Your qualifying days for the purposes of statutory sick pay will be your normal hours of work.

- Healthcare    If the US healthcare plan provides global coverage, you will be covered under this plan, otherwise, BUPA or equivalent if the UK insurance covers US hospitalization.

Benefits under any insurance scheme or plan are subject to the rules of the plan and the terms of any insurance policy and are conditional upon you complying with or satisfying any requirements of the insurer. The Company can, in its discretion, vary any insurance scheme or plan and the Company has no liability to pay any benefit to you under any insurance scheme or plan unless it receives the benefit from the insurer.

5.    Place of Work:

On relocating to the UK, your "normal place of work" will be Priory Business Park, Bedford, You may, however, be required by the Company to work at a variety of places as and where determined by the Company provided that you shall not be required (except for travel or stays on a temporary basis in the ordinary course of his duties hereunder) to go or reside anywhere outside the United Kingdom or USA.

6.    Training:

You will be required to undertake any training identified by the Company so that you are able to fully contribute to the work of the Company.

7.    Holidays:

You will be entitled to 22 days paid annual holiday in addition to 8 days statutory public holidays. A copy of the Company's rules relating to Holidays is attached hereto.

8.    Pension & Employee Benefits Plan:

The Company operates a contributory pension scheme for which all permanent employees will be eligible to join, in accordance with the rules of the scheme. Details will be provided to you on commencement. No Contracting Out Certificate pursuant to the provisions of the Pension Schemes Act 1993 is held by the Company in respect of your employment with the Company. Alternatively, if you are working in the United States or on a U.S. payroll, you may be eligible for the 401k plan in effect for the U.S.



Company (dependent on plan rules and salary payment location.) The Company will make reasonable efforts to accommodate your preference to the extent permitted by law and the particular pension schemes.

The Company reserves the right to terminate the pension scheme at any time without replacing it, in this event your accrued rights will be subject to the trust deeds and rules of the Pension Scheme.

9.   Performance & Conduct:

Your acceptance of this Contract indicates that you agree to abide by the rules and procedures (as amended from time to time) contained in the Company Handbook, which will be provided to you during your probationary period, or, in the United States, is found on the company Intranet, as modified from time to time. If you have a problem connected with your work or working environment or a problem, which though not connected directly, affects your work, OR, if you are the subject of disciplinary action, which you regard as unfair, you should discuss the matter with your immediate supervisor as soon as possible. If the matter cannot be resolved at this stage you should follow the Company's grievance procedure, as the same may be in effect from time to time. The disciplinary and grievance procedures are not contractual and do not form part of your contract.

10.   Confidentiality:

You shall not, except as authorised or required by your duties reveal to any person any of the trade or financial secrets or confidential operations, materials, specifications, chemical processes, process documentation, manufacturing information, quality control information, design control documentation, designs (including experimental designs), ideas, concepts, know-how, processes; dealings, inventions, discoveries, plans, computer programs or other intellectual property, or any information concerning the organisation, business, finances, transactions or affairs of Inverness Medical Innovation Inc. ("The Company") or any of its subsidiaries, (including but not limited to information relating to products, product launches, tactical information, proposed and existing projects, customer lists and marketing information) (all such information hereinafter called "Confidential Information") which may come to your knowledge during your employment and shall keep with complete secrecy all Confidential Information entrusted to you. In particular, but without limitation you agree not to publish, transmit, otherwise disclose or allow access to any of the Confidential Information to any other party whether not employed by the Company unless authorised by the Company; you agree not to copy or reproduce any of the Confidential Information in any manner or form or store any of the Confidential Information in any electronic, digital or other form or medium allowing access to it by any party, unless authorised to do so by the Company; you shall conspicuously label, where practicable, any and all Confidential Information and retain such Confidential Information (insofar as permitted hereunder) by storing it in safe-keeping under secure conditions in a place not generally accessible to parties not authorised to access the Confidential Information or otherwise as directed by the Company from time to time; and you agree not to use any such information in any manner which may injure or cause loss whether directly or indirectly to the Company or any associated company or their respective businesses or may be likely to do so. The restriction contained in this Clause shall extend to any and all information of a confidential or proprietary nature belonging to any third party which is in the custody or control of the Company or Inverness Medical Innovations Inc. and which has been disclosed by such third party to the Company, under

Inverness Medical Innovations

an obligation of confidence. This restriction shall continue to apply after the termination of this Agreement without time limit but shall cease to apply to information or knowledge which comes into the public domain otherwise than by your fault.

11.  Copyright/Intellectual Property:

(a) To the extent you are acting as an employee located in the United States, the following provisions apply, to which U.S. law shall apply:

(i)  The copyright in all works of whatever nature, including but not limited to documentation, computer programs, or any other materials written, originated, conceived or made by you except such as are wholly unconnected with you, services carried out under these terms and conditions during the subsistence of your employment shall belong to and vest in the Company and insofar as not effected by virtue of your employment with the Company, you hereby assign to the Company by way of future assignation of copyright the copyright and all of the proprietary rights (if any) for the full term thereof throughout the world in respect of such works. You hereby waive any and all moral rights you may have in respect of such works.

(ii)  Any and all discoveries, designs, inventions, secret processes or improvements in procedures, systems, equipment or services made, developed, improved upon, written or discovered by you during the subsistence of your employment by the Company in connection with or in any way affecting or relating to any of the businesses of the Company or any associated company or capable of being used or adapted for use therein or in connection therewith shall forthwith be disclosed to the Company and shall belong to and be the absolute property of the Company or such associated company or third party as the Company may deem appropriate, subject to your statutory rights as inventor.

(iii)  You shall forthwith and from time to time, both during your employment and thereafter at the request and cost of the Company, apply for and execute all such documents as may in the opinion of the Company be necessary for or conducive to obtaining patents, registered designs or other equivalent protection in any part of the world for any such discoveries, designs, inventions, processes, improvements, systems, equipment or services referred to in Clause 11(a) and/or to protect and defend the copyright works referred to in Clause 11(b) and/or applicable to vest the same in the Company or in such associated company or third party as the Company may deem appropriate and you hereby irrevocably authorize the Company (for itself and for its relevant associated company or such third party) for the purposes aforesaid to make use of your name and to sign and execute any such documents and to do anything on your behalf (where permissible to obtain the protection in its own name or in that of its nominee(s)) and then you shall not knowingly do any thing to imperil the validity of any such protection or any application therefore or to prejudice any defense thereof but shall at the cost of the Company or its relevant associated company or such third party, as the case may be, render all possible assistance to the Company or its associated company or such third party both in obtaining and in maintaining such protection.

Inverness medical innovations

(b)  To the extent you are acting as an employee located in the United Kingdom, the following provisions apply, to which English law shall apply:

For purposes of this clause, the following definitions apply:

(i)  "Intellectual Property Rights" means (i) copyright, patents, know-how, confidential information, database rights, and rights in trademarks and designs (whether registered or unregistered), (ii) applications for registration, and the right to apply for registration, for any of the same; and (iii) all other intellectual property rights and equivalent or similar forms of protection existing anywhere in the world;

(ii)  "IP Materials" means all documents, software, photographic or graphic works of any type, and other materials in any medium or format which are created by or on behalf of you in the course of performing your obligations under this Agreement and which are protected by or relate to Intellectual Property Rights;

(1)  To the extent that ownership of Intellectual Property Rights does not vest in the Company by operation of law, you hereby assign to the Company or any Group Company all Intellectual Property rights which arise in the course of performing your obligations under this Agreement (including all present and future copyright, and copyright revivals and extensions). This assignment shall take effect upon the creation of each of the Intellectual Property Rights.

(2)  you agree to sign all documents and do all other acts which the Company requests (at its expense) to enable the Company to enjoy the full benefit of this clause. This includes joining in any application, which may be made by the Company's sole name for registration of any Intellectual Property Rights (such as a patent, trademark or registered design).

(3)  you may only use the Intellectual Property Rights and IP Materials to perform your obligations under this Agreement, and shall not disclose any Intellectual Property Rights or IP Materials to any third party without the express prior written consent of the Company.

(4)  you waive all moral rights in IP Materials to which you would otherwise be entitled under the law of any relevant jurisdiction.

(5)  you shall immediately transfer to the company all IP Materials in your possession or under your control when this Agreement expires or terminates for any reason, or at any time when the Company requests transfer. No copies or other record of any IP Materials may be retained by you except with the prior written consent of the Company.

(6)  This clause shall survive expiry of this Agreement, or its termination for any reason.

12.  Other Activities / Protective Covenants:

Inverness medical innovations

(a) To the extent you are acting as an employee located in the United States, the following provisions apply, to which U.S. law shall apply:

(i)     You undertake that you shall not, either on your own account or in conjunction with others, in any capacity whatsoever (which shall include by way of illustration but not limitation accepting employment or acting as a consultant, agent or manager) anywhere in the world and whether directly or indirectly and whether with a view to profit or otherwise during your employment and for a period of six months from the termination of your employment in any way establish, develop, carry on or assist in carrying on or be engaged, concerned, interested or employed in any business enterprise or venture competing or intending to compete in any way with the business of the Company or any part of such business; and for a period of one year from the termination of your employment solicit, canvass or entice away (or endeavor to solicit, canvass or entice away) from the Company the custom of any person, firm or company who was at any time during the period of 12 months immediately preceding the date of termination of your employment a client or customer of the Company for the purpose of offering to such client or customer or obtaining from such supplier of ink goods or services similar to or materially competing with those of the Company or for a period of one year from the date of termination of his/her employment solicit, canvass or entice away (or endeavor to solicit, canvass or entice away) any of the employees of the Company for the purposes of employment by any other person in an enterprise or venture competing with the business of the Company whether or not such person would commit a breach of contract by reason of leaving service.

(ii)    You hereby acknowledge that each of the undertakings given in this Clause constitute entirely separate and independent restrictions on you and agree that if one or more is held to be invalid as an unreasonable restraint of trade or for any reason whatsoever then the remaining covenants shall be valid to the extent that they are not held to be so invalid and insofar as any such covenant would be void as drawn but would be valid if the period of application were reduced or if some part of the undertaking were deleted, the covenant in question shall apply with such modification as may be necessary to make it valid and effective and you agree to execute any further undertaking in such modified terms if requested to do so by the Company.

(iii)   You acknowledge and agree that you have taken or had the opportunity to take independent professional advice in relation to the provisions of this Clause and that such provisions are fair and reasonable.

(b) To the extent you are acting as an employee located in the United Kingdom, the following provisions apply, to which English law shall apply:

In this clause:

(i)     "Relevant Period" means the period of 12 months ending on the Termination Date;

Inverness Medical Innovations

(ii)    "Relevant Area" means any part of any country in which you were actively involved in the business of the Company or another Group Company at any time during the Relevant Period;

(iii)    "Termination Date" means the date on which the employment terminates; and

(iv)    references to the Company or another Group Company include its successors in business if the succession occurs after the Termination Date.

(1)    You covenant with the Company that you will not for a period of six months after the Termination Date be concerned in any business which is carried on in the Relevant Area and which is competitive or likely to be competitive with any business in which you were actively involved during the course of your employment during the Relevant Period and which is carried on by the Company or another Group Company at the Termination Date. For this purpose, you are concerned in a business if:

(a).    you carry it on as principal or agent; or

(b)    you are a partner, director, employee, secondee, consultant or agent in, of or to any person who carries on the business; or

(c)    you have any direct or indirect financial interest (as shareholder or otherwise) in any person who carries on the business; or

(d)    you are a partner, director, employee, secondee, consultant or agent in, of or to any person who has a direct or indirect financial interest (as shareholder or otherwise) in any person who carries on the business,

disregarding any financial interest of a person in securities which are listed or dealt in on any Recognized Investment Exchange if that person, you and any person connected with you (within the meaning of section 839 of the Income and Corporation Taxes Act 1988) are interested in securities which amount to less than five per cent. of the issued securities of that class and which, in all circumstances, carry less than five per cent. of the voting rights (if any) attaching to the issued securities of that class.

If the Company exercises its right to suspend your duties and powers for a period of up to three months during any period after notice of termination of your employment has been given by the Company or you, the aggregate of the period of the suspension and the period after the Termination Date for which the covenant in this subclause applies will not exceed six months and, if the aggregate of the two periods would exceed six months, the period after the Termination Date for which the covenant in this subclause applies will be reduced accordingly.

(2)    You covenant with the Company that you will not directly or indirectly on your own account or on behalf of or in conjunction with any person for a period of six months after the Termination Date (except on behalf of the Company or any Group Company):

(a)    canvass or solicit business or custom for goods of a similar type to those being manufactured or dealt in by the Company or any Group Company at the Termination Date, and with which goods you were actively involved in the course of your employment during the Relevant Period, from any person who has

Inverness medical innovations

been at any time during the Relevant Period a customer of the Company or any Group Company with whom you were actively involved in the course of your employment during the Relevant Period; or

(b)    deal with any such person.

(3)    You covenant with the Company that you will not directly or indirectly on your own account or on behalf of or in conjunction with any person for a period of twelve months after the Termination Date induce or attempt to induce any supplier of the Company or any Group Company or distributor of the Company's or any Group Company's products with whom you were actively involved in the course of your employment during the Relevant Period, to cease to supply, or to restrict or vary the terms of supply to, the Company or any Group Company or to cease to distribute any of the Company's or any Group Company's products or restrict or vary the terms of the distributorship or otherwise interfere with the relationship between a supplier or distributor and the Company or any Group Company.

(4)    You covenant with the Company that you will not directly or indirectly on your own account or on behalf of or in conjunction with any person for a period of twelve months after the Termination Date induce or attempt to induce any employee to whom this subclause applies to leave the employment of the Company or any Group Company (whether or not this would be a breach of contract by the employee). This subclause applies to an employee of the Company or any Group Company with whom you had material dealings in the course of your employment during the Relevant Period and who is employed wholly or mainly in a managerial capacity.

(5)    The covenants in this clause are for the benefit of the Company itself and as trustee for each other Group Company.

(6)    Each of the restrictions in each paragraph or subclause above is enforceable independently of each of the others and its validity is not affected if any of the others is invalid. If any of those restrictions is void but would be valid if some part of the restriction (including part of any of the definitions) were deleted, the restriction in question applies with such modification as may be necessary to make it valid.

(7)    You acknowledge that your senior position with the Company and any Group Company gives you access to and the benefit of confidential information vital to the continuing business of the Company and any Group Company and influence over and connection with the Company's customers, suppliers, distributors, agents, employees, workers, consultants and directors and those of any Group Company in or with which you are engaged or in contact and you acknowledge and agree that the provisions of this clause are reasonable in their application to you and necessary but no more than sufficient to protect the interests of the Company and any Group Company.

(8)    If any person, during your employment or any period during which the covenants in this clause apply, offers to you any arrangement or contract which might or would cause you to breach any of the covenants, you will notify that person of the terms of this clause.

Inverness Medical Innovations

13.  **No Smoking:**

The Company operates a no-smoking policy. Smoking is not permitted on the factory premises. By signing this offer you agree to adhere to this policy.

14.  **Substance Abuse Policy**

The Company operates a substance abuse policy, a copy of which is attached hereto. By signing this offer you agree to adhere to this policy.

15.  **Trade Unions & Collective Agreements:**

Whilst not wishing to remove an individual's right to belong to a Trade Union, the Company does not formally recognize any Trade Union and all negotiations will be a matter solely between the Employee and the Company. No Collective Agreement directly effects your terms and conditions of employment with the Company.

16.  **Start Date:**

Your start date as an employee will be mutually agreed. Grant of stock options, remuneration and other benefits will only commence upon commencement of full time services at such time as you are not employed by any other employer and at a time to be mutually agreed.

18.  **Binding Effect:**

The Employee's obligations under Sections 10, 11 and 12 of this Agreement shall survive termination of the Employee's employment.

19.  **Retirement Age:**

The normal retirement age for all employees is currently 65 for both men and women. If you are an employee in the United Kingdom when you reach the age of 65, you agree that this will apply to you at the discretion of the Company and that English law will apply to this portion of your employment Agreement. Because this portion of the Agreement is governed under English law, you agree that you will not raise any claims in connection with retirement or age discrimination under United States law if any conduct complained of is permissible under English law.

20.  **Medical Examinations:**

You consent to the Company at their expense requiring you to undergo a medical examination either by your own general practitioner, a company doctor or any other relevant specialist for the purpose only of an employment related matter. You also consent to the Company obtaining at their expense a relevant medical report on any such matter.

Oct 08 02 11:06a
04 Oct 02 09:36    Lesley Scott

OF: 00000
01993 700732    p.12    p.2

Inverness medical innovations 

21.    Deductions from Wages:

You agree by your subscription of this Statement that the Company has the right to deduct from your salary on termination of your employment or on reasonable notice any outstanding sum due to them made by way of loan or credit arrangement or at any time during your employment any sum representing cash shortages and/or stock deficiencies.

22.    United States Law:

You agree that United States Law for the Commonwealth of Massachusetts will govern your employment contract, except as specifically stated otherwise herein and that you hereby submit to the non-exclusive jurisdiction of the United States courts in the Commonwealth of Massachusetts.

23.    Acceptance:

I hope that you will indicate acceptance of this offer by signing on the sheet below and initialing each page.  Please return one copy as soon as possible and keep one copy for your records.

Yours sincerely

David Scott
For Inverness Medical Innovations Inc.

Accepted:                        Date:    10/4/02

31 Sawyer Road, Suite 200,
Waltham, Massachusetts USA 02453

Telephone 781.447.3900
Facsimile 781.647.3010

305 444.2266



Candidate: Victor Manneh

### Relocation Package

### Addendum To Inverness Medical Innovation's (IMI) Offer Of Employment Letter

To clarify your offer terms, your IMI *Relocation Plan* includes:

o   $15,000 Relocation Allowance to be utilized for non-shipping related expenses. Funds can be applied to home purchase costs, as listed below, incidentals and UK appliances.

o   The plan also will pay the lesser of two bonafide estimates to pack, ship, insure and temporarily store household goods.

Weber & Company can refer you to a Service which will arrange car shopping and loan/financing for Ex-Pat's, as well as, banking and internet connections. www.inbounduk.com

Morton Fraser Relocation Service (MFR), of Edinburgh, is IMI's designated relocation service provider. MFR will help coordinate and administer your relocation to assure a smooth and effective transition.

### SERVICES PROVIDED:

o   Coordinate and manage acquisition of a valid UK work permit.

### RELOCATION:

o   They will coordinate the two bids for *packing, transportation, insurance and storage* of household goods destined to the UK. Will arrange direct billing with IMI.

o   *Home finding assistance* of which this fee will be taken from relocation allowance. Cost is minimal. This service is not mandatory.

o   Arrangement, as needed, for mortgage shopping and home financing for Ex-Pat's.

o   Arrangement of Solicitor to ensure effective closing. Funds taken from relocation allowance. Will not exceed, 1000 pounds.

o   A note, to purchase home, document stamps equal 1% of the sales price, for those homes purchased for less than 250,000 Sterling. 3% stamp fees for homes purchased greater than 250,000 Sterling. Will provide direct billing from your relocation allowance. You should be able to find housing in the 135k to 220k Sterling range.

Other UK orientation advisement as needed.

Morton Fraser's contact information: Emma Keir, Business Group Manager
30/31 Queen Street, Edinburgh, EH2 1JX
Direct Dial: 01312471241.

255 ALHAMBRA CIRCLE, SUITE 520 ♦ CORAL GABLES, FLORIDA 33134 ♦ TEL: (305) 444-1200 ♦ FAX: (305) 444-2266
E-MAIL: EMAIL@WEBERSTAFF.COM ♦ WWW.WEBERSTAFF.COM

*Exhibit A*    Page  37

# NON-QUALIFIED STOCK OPTION AGREEMENT
## FOR EMPLOYEES

### UNDER THE

## INVERNESS MEDICAL INNOVATIONS, INC.
## 2001 STOCK OPTION AND INCENTIVE PLAN

Name of Optionee:         Victor Manneh
Number of Option Shares:    30,000
Option Exercise Price Per Share:  $10.85
Grant Date:           November 19, 2002
Expiration Date:        November 18, 2012

Pursuant to the Inverness Medical Innovations, Inc. 2001 Stock Option and Incentive Plan (the "Plan") as amended through the date hereof, Inverness Medical Innovations, Inc. (the "Company") hereby grants to the Optionee named above an option (the "Stock Option") to purchase, on or prior to the Expiration Date specified above, all or part of the number of Option Shares of Common Stock, par value $0.001 per share (the "Stock") of the Company specified above at the Option Exercise Price per Share specified above subject to the terms and conditions set forth herein and in the Plan.

1.    Exercisability Schedule.  No portion of this Stock Option may be exercised until such portion shall have become exercisable.  Except as set forth below, and subject to the discretion of the Administrator (as defined in Section 2 of the Plan) to accelerate the exercisability schedule hereunder, this Stock Option shall become exercisable with respect to the following number of Option Shares on the dates indicated, so long as the Optionee remains in employment with the Company on the Exercisability Date:

| Exercisability Date | Number of Option Shares First Becoming Exercisable | Total Number of Option Shares Exercisable |
|---|---|---|
| November 19, 2003 | 7,500   (25%) | 7,500   (25%) |
| November 19, 2004 | 7,500   (25%) | 15,000   (50%) |
| November 19, 2005 | 7,500   (25%) | 22,500   (75%) |
| November 19, 2006 | 7,500   (25%) | 30,000   (100%) |

**EXHIBIT 2**

Once exercisable, this Stock Option shall continue to be exercisable at any time or times prior to the close of business on the Expiration Date, subject to the provisions hereof and of the Plan.

2.  Manner of Exercise.

(a)    The Optionee may exercise this Option only in the following manner: from time to time on or prior to the Expiration Date of this Option, the Optionee may give written notice to the Administrator of his or her election to purchase some or all of the Option Shares purchasable at the time of such notice. This notice shall specify the number of Option Shares to be purchased.

Payment of the purchase price for the Option Shares may be made by one or more of the following methods: (i) in cash, by certified or bank check or other instrument acceptable to the Administrator; (ii) through the delivery (or attestation to the ownership) of shares of Stock that have been purchased by the Optionee on the open market or that have been "paid for" and beneficially owned by the Optionee for at least six months and are not then subject to any restrictions under any Company plan; (iii) by the Optionee delivering to the Company a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the Company cash or a check payable and acceptable to the Company to pay the option purchase price, provided that in the event the Optionee chooses to pay the option purchase price as so provided, the Optionee and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Administrator shall prescribe as a condition of such payment procedure; or (iv) a combination of (i), (ii), and (iii) above. Payment instruments will be received subject to collection.

The delivery of certificates representing the Option Shares will be contingent upon the Company's receipt from the Optionee of full payment for the Option Shares, as set forth above and any agreement, statement or other evidence that the Company may require to satisfy itself that the issuance of Stock to be purchased pursuant to the exercise of Options under the Plan and any subsequent resale of the shares of Stock will be in compliance with applicable laws and regulations. In the event the Optionee chooses to pay the purchase price by previously-owned shares of Stock through the attestation method, the number of shares of Stock transferred to the Optionee upon the exercise of the Option shall be net of the Shares attested to.

(b)    Certificates for shares of Stock purchased upon exercise of this Stock Option shall be issued and delivered to the Optionee upon compliance to the satisfaction of the Administrator with all requirements under applicable laws or regulations in connection with such issuance and with the requirements hereof and of the Plan. The determination of the Administrator as to such compliance shall be final and binding on the Optionee. The Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Stock subject to this Stock Option unless and until this Stock Option shall have been exercised pursuant to the terms hereof, the Company shall have issued and delivered the shares to the Optionee, and the Optionee's name shall have been entered as the stockholder of record on the

books of the Company. Thereupon, the Optionee shall have full voting, dividend and other ownership rights with respect to such shares of Stock.

(c)    The minimum number of shares with respect to which this Stock Option may be exercised at any one time shall be 50 shares, unless the number of shares with respect to which this Stock Option is being exercised is the total number of shares subject to exercise under this Stock Option at the time.

(d)    Notwithstanding any other provision of this Agreement or of the Plan, no portion of this Stock Option shall be exercisable after the Expiration Date.

3.    Termination of Employment. If the Optionee's employment by the Company or a Subsidiary (as defined in the Plan) is terminated, no additional Option Shares shall become exercisable following the date of termination and the period within which to exercise the exercisable portion of the Option may be subject to earlier termination as set forth below.

(a)    Termination Due to Death. If the Optionee's employment terminates by reason of death, any Option held by the Optionee shall become fully exercisable and may thereafter be exercised by the Optionee's legal representative or legatee for a period of twelve months from the date of death or until the Expiration Date, if earlier.

(b)    Termination Due to Disability or retirement. If the Optionee's employment terminates by reason of disability (as determined by the Administrator) or retirement, any Option held by the Optionee shall become fully exercisable and may thereafter be exercised by the Optionee for a period of twelve months from the date of termination or until the Expiration Date, if earlier. The death of the Optionee during the twelve-month period provided in this Section 3(b) shall extend such period for another twelve months from the date of death or until the Expiration Date, if earlier.

(c)    Termination for Cause. If the Optionee's employment terminates for Cause, any Option held by the Optionee shall terminate immediately and be of no further force and effect. For purposes hereof, "Cause" shall mean a vote by the Board resolving that the Optionee shall be dismissed as a result of (i) any material breach by the Optionee of any agreement between the Optionee and the Company; (ii) the conviction of Optionee of any agreement between the Optionee and the Company; (ii) the conviction of Optionee of a felony or a crime involving moral turpitude; or (iii) any material misconduct or willful and deliberate non-performance (other than by reason of disability) by the Optionee of the Optionee's duties to the Company.

(d)    Other Termination. If the Optionee's employment terminates for any reason other than death, disability or Cause, and unless otherwise determined by the Administrator, any Option held by the Optionee may be exercised, to the extent exercisable on the date of termination, for a period of three months from the date of termination or until the Expiration Date, if earlier. Any Option that is not exercisable at such time shall terminate immediately and be of no further force or effect.

The Administrator's determination of the reason for termination of the Optionee's employment shall be conclusive and binding on the Optionee and his or her representatives or legatees.

4.    Incorporation of Plan.  Notwithstanding anything herein to the contrary, this Stock Option shall be subject to and governed by all the terms and conditions of the Plan.  Capitalized terms in this Agreement shall have the meaning specified in the Plan, unless a different meaning is specified herein.

5.    Transferability.  This Agreement is personal to the Optionee, is non-assignable and is not transferable in any manner, by operation of law or otherwise, other than by will or the laws of descent and distribution.  This Stock Option is exercisable, during the Optionee's lifetime, only by the Optionee, and thereafter, only by the Optionee's legal representative or legatee.

6.    Tax Withholding.  The Optionee shall, not later than the date as of which the exercise of this Stock Option becomes a taxable event for Federal income tax purposes, pay to the Company or make arrangements satisfactory to the Administrator for payment of any Federal, state, and local taxes required by law to be withheld on account of such taxable event.  Subject to the written instructions from the Administrator, the Optionee may have the minimum required tax-withholding obligation satisfied, in whole or in part, by (i) authorizing the Company to withhold from shares of Stock to be issued, or (ii) transferring to the Company, a number of shares of Stock with an aggregate Fair Market Value that would satisfy the withholding amount due.

7.    Miscellaneous.

        (a)    Notice hereunder shall be given to the Company at its principal place of business, and shall be given to the Optionee at the address set forth below, or in either case at such other address as one party may subsequently furnish to the other party in writing.

        (b)    This Stock Option does not confer upon the Optionee any rights with respect to continuance of employment by the Company or any Subsidiary.

        (c)    This Stock Option is not intended to be an incentive stock option as defined in Section 422 of the Internal Revenue Code of 1986, as amended.

INVERNESS MEDICAL
INNOVATIONS, INC.

By: _____
Title: General Counsel

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed
to by the undersigned.

Dated: _____1/15/03_____          _____
                                  Optionee's Signature

                                  Optionee's name and address:

                                  _Victor Manneh_____
                                  _16016 Via Dicha._____
                                  _Rancho Santa Fe, CA 92091____

LIBB/1089076.1

Meeting Minutes
9-12-05
Innovations Research and Stirling Medical Innovation

Attending: David Lang, Steve Howell, Andrew Gill, Victor Manneh
Place: Meeting was held at Innovation research in San Diego, California

The meeting encompassed reagent preparation for the SMI electrochemical platform and the mechanism for future collaborations between SMI and the newly formed entity. The group agreed that collaboration between Stirling Medical Innovations (SMI) and Innovations Research (IR) would be beneficial to both groups. IR or the new entity is willing and has the technical ability to provide SMI with the required reagents for the new platform but is in dire need of financial support for survival.

PATENTS
Four provisional patents were written by Victor Manneh and the IR group. These patents were filed on March 29 before the SMI deal was completed and therefore they belong solely to Inverness Medical Innovations. These patents are not in a complete form. Victor Manneh and Andrew Gill will be responsible for completing these patents with the help of the IR group as needed.

Victor Manneh presented progress on the GOD project.

REAGENT PREPARATIONS:
Reagent production goals:
- High specific activity GOD
- Minimize GOD deactivation during modification
- Maximize GOD loading per binding event
- Minimize NSB to capture surface
- Good manufacturability of reagents
- Produce highly characterized reagents

The key technical challenges to the success of the electrochemical (EC)/ magnetic separation approach using GOD are:
- Sensitivity
- Washing and entrapment of unbound label
- Capture efficiency
- Choice of magnetic particle (no iron on surface)
- Electrochemical interference from plasma (e.g. ascorbic acid, Tylenol, etc)
- Hemolysis which releases oxidative/reductive products into plasma

Victor stressed that the sensitivity issue with EC/GOD is a major concern and noted that there is not a sensitive electrochemical assay currently on the market. Victor compared label sensitivity to assay sensitivity for the two labels that IR developed as well as the GOD label. He emphasized the fact that there are losses going from raw label sensitivity to assay sensitivity. For example, with Unibeads this loss is it is 4 orders of magnitude and for TRF it is six orders so far. Enhancement of EC label sensitivity and improvements in assay parameters are needed in order to achieve the required assay sensitivity (see table below). Victor discussed a need for an alternate approach to the EC design if

EXHIBIT 3

current project does not meet sensitivity goals and would like to explore alternative approaches as part of the new entity.

|  | Raw Signal Detection Limit | # of Labels | Assay Sensitivity |
|---|---|---|---|
| Unibead | $1 \times 10^{-15}$ M | 300 | $1 \times 10^{-11}$ M |
| TRF | $1 \times 10^{-18}$ M | 4 | $3 \times 10^{-12}$ M |
| GOD | $7 \times 10^{-12}$ M | ? | ? |

QC assays were discussed and Victor expressed the need to have identical QC assays in both Stirling and San Diego so that both companies speak the same language. IR will transfer QC methods developed in San Diego to SMI. David Lang will try to obtain an Electrochemical Detection instrument for IR.

Reagents and Specifications

The group agreed on the following reagents and specifications for the Glucose Oxidase (GOD) reagents:
- Reagent #1 0.16µm White latex particle with at least 20 GOD per particle and 5 antibodies (anti-NT Pro BNP 1-21) per particle
- Reagent #2 Magnetic particle with at least 5 antibodies (anti-NT Pro BNP 6998)
- Reagent #3 Magnetic particle with at least 20 GOD per particle
- Quantities of Reagents 1, 2, and 3 to be determined

Final shipment of these reagents will be completed by October 31, 2005.

Victor presented a progress report on reagent synthesis and QC procedures. *IR has made white latex particle with GOD/anti-NT Pro BNP antibody #1-21 at two different loading conditions and a polystyrene magnetic particle with anti-NT Pro BNP antibody #6998 and is in the process of producing a magnetic GOD particle for development purposes. IR supplied SMI with white latex GOD/IgG and a streptavidin-GOD conjugate so that SMI can start work on development while IR is doing further reagents preparations (shipped 13 Sept 05).*

QUALITY CONTROL ASSAYS:
Development of the following assays will be done to set specifications:
- GOD Assay
- Protein Assay for particles
- Binding Assay
- Total Protein per Particle
- Surface iron assay is needed but will not be a requirement.

GOD Activity

IR has developed a GOD optical assay that is able to determine GOD activity in the presence of white latex particles with the following specifications:

- Precision less than 5% CV
- Linearity of 0.999 ($r^2$) between 0.1 and 1 U/mL
- White latex particles shown to not interfere at specified concentration

**Protein Assay**
IR has developed a protein assay (BCA) that is compatible with particles and is evaluating methods with increased sensitivity.

**AGREEMENTS**
Upon delivery of the agreed reagents IR is to receive:

- All IR equipment except for the RLS View Genicon Instrument
- $100,000 payment upon approval
- Upon evaluation of reagents and decision to pursue electrochemical approach, SMI will contract for additional reagents and development work

Issues that need further discussion with Dave Scott and Steve Howell (or SMI representative):

- IR's new Entity and its freedom to operate: Freedom to operate on platforms that IR patented and future ideas including but not limited to a homogeneous assay and micro fluidics
- Ownership of IP generated from production of GOD reagents
- Possibility of first right of refusal to Inverness Medical on newly developed platform by the new entity

Issues to be discussed with Dave Scott:

- Discussions on closure of IR on October 31 and the options for employees of either transfer to SMI or accept of a severance package that is to be negotiated. Negotiations regarding severance will take place immediately but is not part of the activity between SMI and IR.

David Lang's comments:
I want to clarify 3 items:

- Equipment that will be shipped to SMI is the Genicon (value circa $47K) & the Malvern Particle (value circa $17K).
- The $100K good will gesture has not in any way been agreed yet. As discussed with you, Steve and I have to get together with Rob Hutchison and put this proposal to him. It has not yet been agreed.
- Wording on your last item should read that "SMI may contract for additional reagents". Again there can be no guarantee here.

Many Thanks,

David

Andrew Gills Comments:
Hi Victor,

My number is 07787 507247. I am going out during the day tomorrow. If you need to call me please do so between 20.30 and 21.30 my time 12.30 and 13.30 your time. If you had ideas for another time please let me know when.

Just to remind you concept (4) was the idea we briefly touched on with Steve regarding polymerisation of the enzyme, but this could equally apply to other reagents.

Regards

Andrew

- + - + - + - + - + -

Dr Andrew Gill
Patent Engineer
Stirling Medical Innovations Ltd
Scion House Unit 10
Stirling University Innovation Park
Stirling FK9 4NF
Tel:  +44(0)1786 450700
Mob: +44(0)7787 507 247
Email: andrewgill@stirlingmedical.com

_____

**From:** Manneh, Victor [mailto:victor.manneh@unipath.com]
**Sent:** Fri 16/09/2005 21:09
**To:** Andrew Gill
**Subject:** RE: Meeting minutes[Scanned]

Andrew

Thank you Andrew, It was a pleasure to meet you, looking forward for more, I will include this in the meeting minutes. lets clarify number 4 i.e polymeric reagents.  I will call you sunday night my time.  Please send phone number.

Victor
-------Original Message-------
**From:** Andrew Gill [mailto:AndrewGill@stirlingmedical.com]
**Sent:** Friday, September 16, 2005 8:55 PM
**To:** Manneh, Victor; Steve, Howell, David Lang
**Subject:** RE: Meeting minutes[Scanned]

Hi Victor,

Thank you for a very pleasant couple of days. I found it really useful.

With regards the minutes I would add something under IP along the lines of: VM and AG discussed several new concepts in addition to four provisional patent applications that were filed on 29 March 2005. The concepts discussed included: (1) Preparation of a surface for high density immobilisation of reagents; (2) Coating of particles to minimise effects of NSB; (3) Preparation of magnetic fluid; (4) Polymeric reagents. The following points were raised in connection with these concepts: Concept (1) has already been disclosed in one of the filed applications, therefore additional information and current best mode will be added before the application is filed as a non-provisional on or before 29 March 2006. Concept (2) is used in an existing product. Concept

(3) requires a significant amount of research and at this stage has not been reduced to practice. Concept (4) is in the research phase and data should be available by 31 October.

Otherwise the minutes seem to be a very good summary.

Look forward to meeting with you again soon,

Regards,

Andrew

Victor Mannen
Digitally signed by
Victor Mannen
DN: cn = Victor
Mannen, C = US
Date: 2008.09.22
13:32:21 -07'00'

**To:** Manneh, Victor; Steve Howell; David Lang
**Subject:** RE: Meeting minutes[Scanned]

Hi Victor,

Thank you for a very pleasant couple of days. I found it really useful.

With regards the minutes I would add something under IP along the lines of : VM and AG discussed several new concepts in addition to four provisional patent applications that were filed on 29 March 2005. The concepts discussed included: (1) Preparation of a surface for high density immobilisation of reagents; (2) Coating of particles to minimise effects of NSB; (3) Preparation of magnetic fluid; (4) Polymeric reagents. The following points were raised in connection with these concepts: Concept (1) has already been disclosed in one of the filed applications, therefore additional information and current best mode will be added before the application is filed as a non-provisional on or before 29 March 2006. Concept (2) is used in an existing product. Concept (3) requires a significant amount of research and at this stage has not been reduced to practice. Concept (4) is in the research phase and data should be available by 31 October.

Otherwise the minutes seem to be a very good summary.

Look forward to meeting with you again soon,

Regards,

Andrew

- + - + - + - + - + - + -

Dr Andrew Gill
Patent Engineer
Stirling Medical Innovations Ltd
Scion House Unit 10
Stirling University Innovation Park
Stirling FK9 4NF
Tel:   +44(0)1786 450700
Mob: +44(0)7787 507 247
Email: andrewgill@stirlingmedical.com


**From:** Manneh, Victor
**Sent:** Friday, September 16, 2005 9:10 PM
**To:** 'Andrew Gill'
**Subject:** RE: Meeting minutes[Scanned]
Andrew

Thank you Andrew, it was a pleasure to meet you, looking forward for more, I will include this in the meeting minutes.  lets clarify number 4 i.e polymeric reagents.  I will call you sunday night my time.  Please send phone number.

Victor

Message

## Manneh, Victor

| | |
|---|---|
| **From:** | Manneh, Victor |
| **Sent:** | Friday, September 23, 2005 10:00 PM |
| **To:** | 'Steve Howell1' |
| **Cc:** | Scott, Dave; Wilkens, Jack; Hempel, Paul; 'robhutchison@stirlingmedical.com' |
| **Subject:** | RE: Summary of where we are with Innovations Research closure |

Steve,

We agreed during your visit to keep a spirit of integrity and collaboration in our interactions during this period as it is beneficial for both sides to continue to work together. We continued over the next two days in this spirit and I thought we accomplished a great deal for the benefit of both SMI and IR. The results of our work are summarized in the meeting minutes.

Let's keep the spirit that we established during your visit with David and Andrew even though Anne Warner is trying to take us to a place that we both do not want to go. Here are my comments on your email:

Your (Steve's) comments:
1- Innovations Research will be closing on 31 October 2005
2- Innovations Research staff will finish on 31 October 2005 and be paid up according to their employment contracts
3- You (Victor) propose to start a new company
4- We have discussed a proposal whereby you deliver reagents in return for equipment and cash to help start your business
5- Anne is drafting a contract based on what we discussed – this proposal needs to be approved by Corporate and then will be sent to you

Regarding your first, third and fourth points – Your comments are consistent with our agreement.

However, the second comment regarding IR employees is more accurately described in the meeting minutes I've forwarded. Our agreement was as follows "Discussions on closure of IR on October 31 and the options for employees of either transfer to SMI or acceptance of a severance package that is to be negotiated. Negotiations regarding severance will take place immediately but is not part of the activity between SMI and IR". We referred these matters to Dave Scott as he is my boss, and I also wanted to keep the proposal on the move to Scotland Open.

Regarding comment five - We did not discuss the involvement of Anne Warner. I described to you Anne Warner's unprofessional behaviour and read her email of September 12, 2005 that was riddled with inaccuracies that she herself has since recognized and apologized for. I believe that Anne Warner has effectively disqualified herself from participating in these discussions. I suggest that Paul Hemple assign someone else to handle these proceedings and this person should only become involved after we have finalized the details of an agreement.

Bellow, for reference, is a summary of our agreements and Anne Warner's correspondence:

AGREEMENTS
Upon delivery of the agreed reagents IR is to receive:

Message

---

○   All IR equipment except for the RLS View Genicon Instrument and the particle sizer
    $100,000 payment upon approval, by Rob Hutchinson
○   Upon evaluation of reagents and decision to pursue electrochemical approach, SMI may contract for
    reagents and development work

Issues that need further discussion with Dave Scott and Steve Howell (or SMI representative):
○   IR's new Entity and its freedom to operate: Freedom to operate on platforms that IR patented and fut
    including but not limited to a homogeneous assay and micro fluidics
○   Ownership of IP generated from production of GOD reagents
○   Possibility of first right of refusal to Inverness Medical on newly developed platform by the new enti

Anne Warner's email:

----Original Message----
From: Warner, Anne
Sent: Monday, September 12, 2005 4:13 PM
To: Manneh, Victor
Cc: Garrett, Katie
Subject: Wind-down of Innovations Research

Victor –

I will be asking Katie Garrett, our most recently hired lawyer in the Inverness legal department, to assist you in
winding down Innovations Research. I will assist her as needed. As far as I can tell, the following needs to be done:

1)   We need a copy of the lease in order to figure out how to terminate it, or transfer it to you if you
     intend to keep the same space.
2)   You need to decide the date on which you will provide notice to the current five (?) employees.
     There is no requirement for notice, although two weeks is generally a professionally acceptable
     period. They will receive the standard Inverness severance package, which is two weeks pay plus
     one week for every year they have been with the company. Katie will prepare their severance
     documents for your use.
3)   We will draft a separate severance letter for you, referring to the terms of your employment
     agreement including the three month notice period. It is still my understanding that you were given
     notice on July 29th by Dave, but I'm open to your view on this. We can discuss. Certainly, as of our
     discussion last week, you have been provided with notice!
4)   Your severance letter will also contain the agreement about the handover of certain equipment if you
     hit the milestones to be defined by Steve Howell this week.. I suggest to you that you set up a
     corporation between now and the close-down to transfer the equipment into. However, if you want it
     transferred to you personally, that is fine as well. In either case, it will be transferred on an "as is"
     basis.

Let me know if this list is complete from your point of view. You can call me or you can call Katie, whose number is
781 314 4070.

Thanks!

Anne

Anne

I have not been given a termination notice from Steve Howell or Dave Scott. I corrected you regarding that. I will not
accept a notice from you.

The request was for us to move to Scotland and I said that that it was going to be difficult to move immediately

because of our personal lives, and needed to discuss alternatives.

Please in the future be sure of our status before announcing termination notices, as you are not familiar with my discussions with Dave Scott, Olly Davis and Steve Howell. Please read my contract or ask Katie Garret to read it.

We are discussing the transfer activity so both the Stirling group and Innovations Research or the new entity will mutually benefit.

Regards

Victor

> ------Original Message-----
> From: Steve Howell1 [mailto:stevehowell1@tiscali.co.uk]
> Sent: Friday, September 23, 2005 6:23 PM
> To: Manneh, Victor
> Cc: robhutchison@stirlingmedical.com; Warner, Anne; Duek, Nava
> Subject: Summary of where we are with Innovations Research closure
>
> Hi Victor,
>
> I thought it would be useful to summarise where we are with the Innovations Research closure in light of our discussions over the last week.
>
> - Innovations Research will be closing on 31 October 2005
> - Innovations Research staff will finish on 31 October 2005 and be paid up according to their employment contracts
> - You propose to start a new company
> - We have discussed a proposal whereby you deliver reagents in return for equipment and cash to help start your business
> - Anne is drafting a contract based on what we discussed – this proposal needs to be approved by Corporate and then will be sent to you
>
> In the meantime we need to know whether you will be taking on the lease of your current facility. We need to know this before 1 October so that the lease can be assigned to you, otherwise we will have to give notice to the landlord on 1 October. Can you advise Anne whether or not you will be taking forward the current lease? If we do not have a response by 1 October we will assume that you will not be taking on the lease and we will issue notice to the landlord.
>
> I will next be over in San Diego on 13th October, look forward to seeing you then.
>
> Regards
>
> Steve

October ___, 2005

Victor Manneh
11686 Carmel Creek Rd. #107
San Diego, CA 92130

Dear Mr. Manneh:

As more fully set forth below, Innovations Research, LLC (together with its parent and affiliated companies collectively, the "Company") desires to provide you with severance pay in exchange for certain agreements by you. This letter confirms the termination of your employment with the Company, effective as of the close of business day on October 31, 2005 (the "Separation Date"), pursuant to notice provided to you on September 12th by Steve Howell, as directed by Dave Scott. The following information is provided to assist you with your transition and includes the Company's offer of severance contingent on your execution of this Severance Letter Agreement.

1.   **Severance Pay.**   Subject to your execution of this Agreement, which includes a standard release of claims, and in exchange for the other mutual promises set forth in this letter, as soon as practical following the effective date of the Agreement as described in Section 7, the Company agrees to provide you with the following severance pay (the "Severance Pay"):

(i)   A lump sum payment in the amount of $35,000, less all required local, state, federal and other employment-related taxes and deductions, which sum represents three (3) months of your current base salary of $140,000.

You acknowledge and agree that the Severance Pay to be provided to you is not intended to, and shall not constitute, a severance plan, and shall confer no benefit on anyone other than the parties hereto. You further acknowledge that you have been paid and provided all wages, commissions, bonuses, vacation pay, holiday pay and any other form of compensation that may be due to you now or which would have become due in the future in connection with your employment with or separation of employment from the Company. Except as set forth in this letter, the Company has previously paid all salary, vacation accrual and bonus to which you are entitled through the Separation Date under all other compensation or reimbursement arrangements. From and after the Separation Date, you shall have no right to compensation or benefits beyond those specifically provided for in this Agreement.

2.   **Additional Benefits.**   The additional benefits will be provided to you regardless of whether you sign this Severance Agreement:

(i)   Your final paycheck for services performed through the Separation Date, in the

1

**EXHIBIT 4**

*Exhibit  A   Page  52*

total amount of $3,230.77, less applicable withholdings and deductions.

(ii)    Payment for your vacation time accrued but unused through the Separation Date in the amount of $_____, less applicable withholdings and deductions.

(iii)    Benefits as following the company plan and company schedule relating to the roll-over of any 401-K plan and life insurance.

(iv)    The following stock option benefits:

(a)    As previously approved by the Board of Directors of Inverness Medical Innovations, Inc., you have been issued nonqualified stock options to purchase 30,000 shares of the common stock of Inverness Medical Innovations, Inc., 15,000 of which will be vested as of your Separation Date and will remain exercisable for three months thereafter in accordance with the terms of the 2001 Stock Option and Incentive Plan and your Non-Qualified Stock Option Agreement.

(b)    The previously issued nonqualified stock options to purchase 5,000 shares of the common stock of the Inverness Medical Innovations, Inc., 2,500 of which will be vested as of your Separation Date and will remain exercisable for twelve months thereafter in accordance with the terms of the 2001 Stock Option and Incentive Plan and your Non-Qualified Stock Option Agreement.

(v)    Upon termination, you are eligible to continue your current health and dental benefits through COBRA. Participation is voluntary. Under COBRA, you can maintain your health and/or dental insurance(s) for up to eighteen (18) months following the Separation Date. You will be responsible for the full cost of the insurance coverage should you wish to continue. Please note that these benefits are subject to periodic review and revision by the Company. This means that if the Company's rates change during the COBRA period, you will be responsible for any increases. You acknowledge that with this letter you have received details concerning your rights under COBRA.

Further, you will be paid for any outstanding expenses reimbursable under Company policy upon receipt and approval of an appropriate expense report.

3.    Covenants by You. You expressly acknowledge and agree to the following:

(i)    You will have returned all Company property, including but not limited to your office keys, laptop computer, Company documents and files, and any other computer hardware, disks or files in your possession, custody or control, whether maintained by you at work or off-site, before the Separation Date. You further acknowledge that you will have retrieved from the Company as of the date of termination all of your personal effects;

(ii)    that you will abide by the Company's Nondisclosure, Nonsolicitation and Developments Agreement you entered into, the terms of which are hereby incorporated

2

by reference, and that you will abide by any and all common law and/or statutory obligations relating to protection and non-disclosure of the Company's trade secrets and/or confidential and proprietary documents and information;

(iii)    that you confirm that any and all discoveries, inventions, ideas, concepts, processes, products, methods and improvements, or parts thereof, conceived, developed, or otherwise made by you, alone or jointly with others and in any way relating to the Company's present or proposed products, programs or services or to tasks assigned to you during the course of your employment, whether or not subject to copyright or patent protection and whether or not reduced to tangible form or reduced to practice, during the period of your employment with the Company, whether or not made during your regular working hours or on the Company's premises (collectively referred to herein as "Developments") belong to and are the sole property of the Company and have been assigned to the Company. You further confirm that all such Developments constitute works made for hire under the copyright laws of the United States and that the assignments to the Company were for all of your right, title and interest in such Developments and in all copyrights, patents, reproduction and other proprietary rights you may have had in any such Developments, together with the right to file for or own wholly without restriction United States and foreign patents, trademarks and copyrights with respect thereto;

(iv)    that all information relating in any way to this Agreement, including the terms and amount of financial consideration provided for in this Agreement, shall be held confidential by you and shall not be publicized or disclosed to any person (other than an immediate family member, legal counsel or financial advisor, provided that any such individual to whom disclosure is made agrees to be bound by these confidentiality obligations), business entity or government agency (except as mandated by law);

(v)    that you will not make any statements that are professionally or personally disparaging about, or adverse to, the interests of the Company (and its officers, directors and managers) including, but not limited to, any statements that disparage any such person, product, service, finances, financial condition, capability or any other aspect of the business of the Company, and that you will not engage in any conduct which is intended to harm professionally or personally the reputation of the Company and/or its officers, directors and managers;

(vi)    that you will not counsel or assist any attorneys or their clients in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints by any third party against the Company and/or any officer, director, employee, agent, representative, shareholder or attorney of the Company, unless under a subpoena or other court order to do so; and

(vii)    that the breach of any of the foregoing covenants by you shall constitute a material breach of this Agreement and shall relieve the Company of any further obligations hereunder and, in addition to any other legal or equitable remedy available to the

Company, shall entitle the Company to recover any Severance Pay already paid to you pursuant to Section 1 of this letter.

4.     Release of Claims.

(i)     You hereby agree and acknowledge that by signing this Agreement and accepting the Severance Pay discussed in Section 1 and other good and valuable consideration, you are waiving your right to assert any and all forms of legal Claims against the Company[1] of any kind whatsoever, arising from the beginning of time through the date you execute this Agreement.  With the sole and limited exceptions set forth in paragraph (ii) below, for purposes of this Section 4 the words "Claim" and "Claims" are intended to be as broad as the law allows and to mean: any and all charges, complaints and other form of action against the Company, seeking any form of relief including, without limitation, equitable relief (whether declaratory, injunctive or otherwise), the recovery of any damages, or any other form of monetary recovery whatsoever (including, without limitation, back pay, front pay, compensatory damages, emotional distress damages, punitive damages, attorney's fees and any other costs) against the Company, including, without limitation:

(a)     Claims under any California (or any other state) or federal discrimination, fair employment practices or other employment related statute, regulation or executive order (as they may have been amended through the date you sign this Agreement), including the federal Age Discrimination Employment Act;

(b)     Claims under any other California (or any other state) or federal employment related statute, regulation or executive order (as they may have been amended through the date you sign this Agreement);

(c)     Claims under any California (or any other state) or federal common law theory;

(d)     Any other Claims arising under other state or federal law.

In furtherance of this intention, each party hereto expressly waives any rights or benefits conferred by the provisions of Section 1542 of the Civil Code of the State of California, which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

(ii)     Notwithstanding the foregoing, this Section 4 shall not release the Company from any obligation expressly set forth in this Agreement, and does not preclude you from filing a charge of discrimination with the United States Equal Employment Opportunity

---

[1] For purposes of this Section, the term "Company" includes Inverness Medical Innovations, Inc. and any of its divisions, affiliates (which means all persons and entities directly or indirectly controlling, controlled by or under common control with Inverness), parents, subsidiaries and all other related entities, and its and their directors, officers, employees, trustees, agents, successors and assigns.

4

*Exhibit A   Page 55*

Commission ("EEOC"), but you will not be entitled to any monetary or other relief from the EEOC or from any Court as a result of litigation brought on the basis of or in connection with such charge.

(iii)    You expressly acknowledge and agree that, but for providing the foregoing release of Claims, you would not be receiving the Severance Pay being provided to you under the terms of this Agreement.

5.    **Entire Agreement/Choice of Law/Enforceability.**  You acknowledge and agree that, with the exception of the Agreement identified in Section 3, this Agreement supersedes any and all prior or contemporaneous oral and/or written agreements between you and the Company, and sets forth the entire agreement between you and the Company. No variations or modifications hereof shall be deemed valid unless reduced to writing and signed by the parties hereto. This Agreement shall be deemed to have been made in the State of California, shall take effect as an instrument under seal within California, and shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflict of laws principles. The provisions of this letter are severable, and if for any reason any part hereof shall be found to be unenforceable, the remaining provisions shall be enforced in full.

6.    **Arbitration.**  You and the Company agree that any and all disputes arising out of the terms of this Agreement, their interpretation, and any of the matters herein released, shall first be subject to mediation by a reputable third party mediator, agreed on by the parties. In the event of the failure of such mediation, the matter shall become subject to binding arbitration to the extent permitted by law, before the American Arbitration Association under its National Rules for the Resolution of Employment Disputes. The parties hereby waive their right to jury trial as to matters arising out of the terms of this Agreement and any matters herein released to the extent permitted by law. The Parties agree that the prevailing party in any arbitration shall be entitled to injunctive relief in any court of competent jurisdiction to enforce the arbitration award. Notwithstanding the foregoing, the Company may immediately seek injunctive relief in a court of competent jurisdiction for your violation of the restrictive covenants set forth in the Nondisclosure, Nonsolicitation and Developments Agreement between you and the Company.

7.    **Understanding this Agreement.**  Before signing this Agreement, you should take whatever steps you believe are necessary to ensure that you understand what you are signing, what benefits you are receiving and what rights you are giving up.

(a)    Regardless of the date on which you sign this Agreement, you and the Company agree that your actual date of termination is October 31, 2005.

(b)    By signing this Agreement, you are acknowledging that you have read it carefully and understand all of its terms.

(c)    You understand and acknowledge that, if you do not sign this Agreement including the Release of Claims, you would not be receiving any Severance Pay.

(d)    You understand that, among other claims you are releasing in the Release of Claims, are any claims against the Company alleging discrimination on the basis of age.

5

(e)    You are hereby advised and encouraged to consult with legal counsel for the purpose of reviewing the terms of this Agreement.

(f)    You understand that the Severance Pay is provided in consideration of your obligations herein, including but not limited to Sections 3 and 4.

(g)    You are being given twenty-one (21) days in which to consider this Agreement and whether to accept this Agreement (which may be waived by signing and returning this Agreement prior to the expiration of the 21-day period). If you choose to accept this Agreement within that time, you are to sign and date below and return it to the Company, c/o Nava Duek, Inverness Medical, 51 Sawyer Road, Suite 200, Waltham, MA 02453.

(h)    Even after the execution of this Agreement, you will have an additional seven (7) days to revoke this Agreement. You should carefully consider all the terms of this Agreement during such period of time, and decide whether they are still applicable as of the date of execution. The Company will remain committed to the terms hereof during such seven (7) day period. The Agreement will not be effective or enforceable by you until this seven (7) day period has expired, and you specifically acknowledge that if you do not revoke this Agreement it shall be considered fully effective at the expiration of said period. In order to revoke your assent to this Agreement, you must, within seven (7) days after execution hereof, deliver a written notice of rescission to Nava Duek at the address noted above. To be effective, the notice of rescission must be hand delivered, or postmarked with the seven (7) day period and sent by certified mail, return receipt requested, to the referenced address.

Very truly yours,

By:    _____
Dave Scott
Inverness Medical Innovations, Inc.

Dated:

Confirmed and Agreed:

_____
Victor Manneh

Dated:

6

October 25, 2005

Victor Manneh
11686 Carmel Creek Rd. #107
San Diego, CA 92130

Dear Mr. Manneh:

    As more fully set forth below, Innovations Research, LLC (together with its parent and affiliated companies collectively, the "Company") desires to provide you with severance pay in exchange for certain agreements by you. This letter confirms the termination of your employment with the Company, effective as of the close of business day on November 19, 2005 (the b"Separation Date"). The following information is provided to assist you with your transition and includes the Company's offer of severance contingent on your execution of this Severance Letter Agreement.

    1.   **Severance Pay.**  Subject to your execution of this Agreement, which includes a standard release of claims, and in exchange for the other mutual promises set forth in this letter, as soon as practical following the effective date of the Agreement as described in Section 7, the Company agrees to provide you with the following severance pay (the "Severance Pay"):

    (i)   A lump sum payment in the amount of $35,000, less all required local, state, federal and other employment-related taxes and deductions, which sum represents three (3) months of your current base salary of $140,000.

    You acknowledge and agree that the Severance Pay to be provided to you is not intended to, and shall not constitute, a severance plan, and shall confer no benefit on anyone other than the parties hereto. You further acknowledge that you have been paid and provided all wages, commissions, bonuses, vacation pay, holiday pay and any other form of compensation that may be due to you now or which would have become due in the future in connection with your employment with or separation of employment from the Company. Except as set forth in this letter, the Company has previously paid all salary, vacation accrual and bonus to which you are entitled through the Separation Date under all other compensation or reimbursement arrangements. From and after the Separation Date, you shall have no right to compensation or benefits beyond those specifically provided for in this Agreement.

    2.   **Additional Benefits.**  The additional benefits will be provided to you regardless of whether you sign this Severance Agreement:

    (i)   Your final paycheck for services performed through the Separation Date, in the total amount of $3,230.77, less applicable withholdings and deductions.

1

EXHIBIT 5
Exhibit A Page 58

(ii)   Payment for your vacation time accrued but unused through the Separation Date in the amount of $_____, less applicable withholdings and deductions.

(iii)  Payment for any expenses incurred in the ordinary course of business and consistent with the Company's expense reimbursement policies for which you can produce receipts that were accrued within the ninety day period prior to your Separation Date.

(iv)   Benefits as following the company plan and company schedule relating to the roll-over of any 401-K plan and life insurance.

(v)    The following stock option benefits:

   (a)   As previously approved by the Board of Directors of Inverness Medical Innovations, Inc., you have been issued nonqualified stock options to purchase 30,000 shares of the common stock of Inverness Medical Innovations, Inc., 22,500 of which will be vested as of your Separation Date and will remain exercisable for three months thereafter in accordance with the terms of the 2001 Stock Option and Incentive Plan and your Non-Qualified Stock Option Agreement.

   (b)   The previously issued nonqualified stock options to purchase 5,000 shares of the common stock of the Inverness Medical Innovations, Inc., 2,500 of which will be vested as of your Separation Date and will remain exercisable for twelve months thereafter in accordance with the terms of the 2001 Stock Option and Incentive Plan and your Non-Qualified Stock Option Agreement.

(v)    Upon termination, you are eligible to continue your current health and dental benefits through COBRA. Participation is voluntary. Under COBRA, you can maintain your health and/or dental insurance(s) for up to eighteen (18) months following the Separation Date. You will be responsible for the full cost of the insurance coverage should you wish to continue. Please note that these benefits are subject to periodic review and revision by the Company. This means that if the Company's rates change during the COBRA period, you will be responsible for any increases. You acknowledge that with this letter you have received details concerning your rights under COBRA.

   Further, you will be paid for any outstanding expenses reimbursable under Company policy upon receipt and approval of an appropriate expense report.

3.     Equipment Rights and Intellectual Property Exchange. The parties acknowledge that ownership of all equipment currently used by Innovations Research (the "Equipment") is and shall remain with the Company. As soon as practicable after the Separation Date, the Company shall select which of the Equipment it wishes to transfer to Stirling. Within one month of the Separation Date, the Company will provide you with a list of the remaining Equipment from which you may select the items to lease for your

2

continued use. The equipment shall be leased to you from the Separation Date for a period of 3 years for $1 per month, which lease amount shall not be construed as reflecting the value of said Equipment. As consideration for use of the Equipment at such reduced rental fee, you agree that the Company has an exclusive, worldwide, perpetual, royalty-free, sublicenseable license for use in the area of cardiology to all intellectual property rights in any and all inventions and/or developments, including all related know-how, which are created by you or any of your employees or agents during the period of 3 years from the Separation Date. Such license shall include the right (but not the obligation) to file, prosecute, and enforce patents on such intellectual property in your name, and you agree to cooperate with the Company in any such filing, prosecution, and/or enforcement. The lease may be terminated by Inverness with one month's notice.

4.    **Covenants by You.** You expressly acknowledge and agree to the following:

(i)    You will have returned all Company property, including but not limited to your office keys, laptop computer, Company documents and files, and any other computer hardware, disks or files in your possession, custody or control, whether maintained by you at work or off-site, before the Separation Date. You further acknowledge that you will have retrieved from the Company as of the date of termination all of your personal effects;

(ii)    that you will abide by the Company's Nondisclosure, Nonsolicitation and Developments Agreement you entered into, the terms of which are hereby incorporated by reference, and that you will abide by any and all common law and/or statutory obligations relating to protection and non-disclosure of the Company's trade secrets and/or confidential and proprietary documents and information;

(iii)    that you confirm that any and all discoveries, inventions, ideas, concepts, processes, products, methods and improvements, or parts thereof, conceived, developed, or otherwise made by you, alone or jointly with others and in any way relating to the Company's present or proposed products, programs or services or to tasks assigned to you during the course of your employment, whether or not subject to copyright or patent protection and whether or not reduced to tangible form or reduced to practice, during the period of your employment with the Company, whether or not made during your regular working hours or on the Company's premises (collectively referred to herein as "Developments") belong to and are the sole property of the Company and have been assigned to the Company. You further confirm that all such Developments constitute works made for hire under the copyright laws of the United States and that the assignments to the Company were for all of your right, title and interest in such Developments and in all copyrights, patents, reproduction and other proprietary rights you may have had in any such Developments, together with the right to file for or own wholly without restriction United States and foreign patents, trademarks and copyrights with respect thereto;

(iv)    that all information relating in any way to this Agreement, including the terms and amount of financial consideration provided for in this Agreement, shall be held

3

confidential by you and shall not be publicized or disclosed to any person (other than an immediate family member, legal counsel or financial advisor, provided that any such individual to whom disclosure is made agrees to be bound by these confidentiality obligations), business entity or government agency (except as mandated by law);

(v)    that you will not make any statements that are professionally or personally disparaging about, or adverse to, the interests of the Company (and its officers, directors and managers) including, but not limited to, any statements that disparage any such person, product, service, finances, financial condition, capability or any other aspect of the business of the Company, and that you will not engage in any conduct which is intended to harm professionally or personally the reputation of the Company and/or its officers, directors and managers;

(vi)    that you will not counsel or assist any attorneys or their clients in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints by any third party against the Company and/or any officer, director, employee, agent, representative, shareholder or attorney of the Company, unless under a subpoena or other court order to do so; and

(vii)    that the breach of any of the foregoing covenants by you shall constitute a material breach of this Agreement and shall relieve the Company of any further obligations hereunder and, in addition to any other legal or equitable remedy available to the Company, shall entitle the Company to recover any Severance Pay already paid to you pursuant to Section 1 of this letter.

5.    Release of Claims.

(i)    You hereby agree and acknowledge that by signing this Agreement and accepting the Severance Pay discussed in Section 1 and other good and valuable consideration, you are waiving your right to assert any and all forms of legal Claims against the Company[1] of any kind whatsoever, arising from the beginning of time through the date you execute this Agreement. With the sole and limited exceptions set forth in paragraph (ii) below, for purposes of this Section 4 the words "Claim" and "Claims" are intended to be as broad as the law allows and to mean: any and all charges, complaints and other form of action against the Company, seeking any form of relief including, without limitation, equitable relief (whether declaratory, injunctive or otherwise), the recovery of any damages, or any other form of monetary recovery whatsoever (including, without limitation, back pay, front pay, compensatory damages, emotional distress damages, punitive damages, attorney's fees and any other costs) against the Company, including, without limitation:

(a)    Claims under any California (or any other state) or federal discrimination, fair employment practices or other employment related statute, regulation or

[1]    For purposes of this Section, the term "Company" includes Inverness Medical Innovations, Inc. and any of its divisions, affiliates (which means all persons and entities directly or indirectly controlling, controlled by or under common control with Inverness), parents, subsidiaries and all other related entities, and its and their directors, officers, employees, trustees, agents, successors and assigns.

4

executive order (as they may have been amended through the date you sign this Agreement), including the federal Age Discrimination Employment Act;

(b)    Claims under any other California (or any other state) or federal employment related statute, regulation or executive order (as they may have been amended through the date you sign this Agreement);

(c)    Claims under any California (or any other state) or federal common law theory;

(d)    Any other Claims arising under other state or federal law.

In furtherance of this intention, each party hereto expressly waives any rights or benefits conferred by the provisions of Section 1542 of the Civil Code of the State of California, which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

(ii)    Notwithstanding the foregoing, this Section 4 shall not release the Company from any obligation expressly set forth in this Agreement, and does not preclude you from filing a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), but you will not be entitled to any monetary or other relief from the EEOC or from any Court as a result of litigation brought on the basis of or in connection with such charge.

(iii)    You expressly acknowledge and agree that, but for providing the foregoing release of Claims, you would not be receiving the Severance Pay being provided to you under the terms of this Agreement.

6.    **Entire Agreement/Choice of Law/Enforceability.**  You acknowledge and agree that, with the exception of the Agreement identified in Section 3, this Agreement supersedes any and all prior or contemporaneous oral and/or written agreements between you and the Company, and sets forth the entire agreement between you and the Company.  No variations or modifications hereof shall be deemed valid unless reduced to writing and signed by the parties hereto.  This Agreement shall be deemed to have been made in the State of California, shall take effect as an instrument under seal within California, and shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflict of laws principles.  The provisions of this letter are severable, and if for any reason any part hereof shall be found to be unenforceable, the remaining provisions shall be enforced in full.

7.    **Arbitration.**  You and the Company agree that any and all disputes arising out of the terms of this Agreement, their interpretation, and any of the matters herein released, shall first be subject to mediation by a reputable third party mediator, agreed on by the parties.  In the event of the failure of such mediation, the matter shall become subject to binding arbitration to the extent permitted by law, before the American Arbitration Association under its National Rules for the Resolution of Employment Disputes.  The parties hereby waive their right to jury trial as

5

to matters arising out of the terms of this Agreement and any matters herein released to the extent permitted by law. The Parties agree that the prevailing party in any arbitration shall be entitled to injunctive relief in any court of competent jurisdiction to enforce the arbitration award. Notwithstanding the foregoing, the Company may immediately seek injunctive relief in a court of competent jurisdiction for your violation of the restrictive covenants set forth in the Nondisclosure, Nonsolicitation and Developments Agreement between you and the Company.

8.    <u>Understanding this Agreement.</u>  Before signing this Agreement, you should take whatever steps you believe are necessary to ensure that you understand what you are signing, what benefits you are receiving and what rights you are giving up.

(a)    Regardless of the date on which you sign this Agreement, you and the Company agree that your actual date of termination is October 31, 2005.

(b)    By signing this Agreement, you are acknowledging that you have read it carefully and understand all of its terms.

(c)    You understand and acknowledge that, if you do not sign this Agreement including the Release of Claims, you would not be receiving any Severance Pay.

(d)    You understand that, among other claims you are releasing in the Release of Claims, are any claims against the Company alleging discrimination on the basis of age.

(e)    You are hereby advised and encouraged to consult with legal counsel for the purpose of reviewing the terms of this Agreement.

(f)    You understand that the Severance Pay is provided in consideration of your obligations herein, including but not limited to Sections 3 and 4.

(g)    You are being given twenty-one (21) days in which to consider this Agreement and whether to accept this Agreement (which may be waived by signing and returning this Agreement prior to the expiration of the 21-day period). If you choose to accept this Agreement within that time, you are to sign and date below and return it to the Company, c/o Nava Duek, Inverness Medical, 51 Sawyer Road, Suite 200, Waltham, MA 02453.

(h)    Even after the execution of this Agreement, you will have an additional seven (7) days to revoke this Agreement. You should carefully consider all the terms of this Agreement during such period of time, and decide whether they are still applicable as of the date of execution. The Company will remain committed to the terms hereof during such seven (7) day period. The Agreement will not be effective or enforceable by you until this seven (7) day period has expired, and you specifically acknowledge that if you do not revoke this Agreement it shall be considered fully effective at the expiration of said period. In order to revoke your assent to this Agreement, you must, within seven (7) days after execution hereof, deliver a written notice of rescission to Nava Duek at the address noted above. To be effective, the notice of rescission must be hand delivered, or

6

postmarked with the seven (7) day period and sent by certified mail, return receipt requested, to the referenced address.

Very truly yours,

By: _____
Dave Scott
Inverness Medical Innovations, Inc.

Dated:

Confirmed and Agreed:

_____
Victor Manneh

Dated:

7

All weights are estimated.

To track the status of this shipment online, please use the following:
https://www.fedex.com/fedexiv/us/findit/nrp.jsp?tracknumbers=712189355921&languag
e=en&opco=FX&clienttype=ivpodalrt

This tracking update has been sent to you by FedEx on the behalf of the Requestor noted
above. FedEx does not validate the authenticity of the requestor and does not validate,
guarantee or warrant the authenticity of the request, the requestor's message, or the
accuracy of this tracking update. For tracking results and fedex.com's terms of use, go to
fedex.com.

Thank you for your business.

**From:** David Scott [dave.scott@zen.co.uk]
**Sent:** Wednesday, October 26, 2005 11:23 PM
**To:** Manneh, Victor
**Cc:** Warner, Anne; Leisenring, Steve
**Subject:** RE: GO Reagents Shipment[Scanned]
Victor

This is the final offer. Please review it carefully and let me know whether you accept. I will send a
signed copy with the final amounts added by Steve Leisenring.

I've taken out any reference to the equipment. We can discuss that separately after you decide
on this.

Termination date is 19th November, The severance payment is $50k i.e. 4 months plus 8 days,
Options are 22,500 from your first option grant since you accepted the four year vesting period,
Expenses are those with receipts within last 90 days.

Dave

Need final termination notice #3

-----Original Message-----
**From:** Manneh, Victor
**Sent:** Thursday, November 10, 2005 2:55 AM
**To:** Scott, Dave
**Cc:** Zwanziger, Ron
**Subject:** Termination agreement

Dave

**EXHIBIT 6**

I cannot accept the Terms of the Separation sent October 26, 2005. I cannot sign this agreement because once I sign it; I will be releasing all my claims towards the equipments and my shares. I have tried to call you several times without success. Please let's find a resolution to this.

1. I had a deal on the stocks to be vested over three years and did not make a big deal over it when through no fault of mine the deal changed. I trusted that you correct the mistake and followed your instructions by signing the four years vesting on the basis that you will find a way to correct it. I will be willing to let this one go if I receive the equipments.

2. I was told that the equipments will be mine upon completion of milestones and in reliance of that promise, met those milestones, and are entitled to the equipments. Nothing less is fair.

Let talk and find a way through this. What do you think of nonexclusive rights for NTproBNP, cTnI, CKMB and Myoglobin. Dave lets live and let live here I want to be able to raise money.

I hope you know that I am merely trying to protect myself from being taken advantage of. I want what is right so we can all move forward.

Regarding the proposal to Ron, Jan will feel more comfortable presenting a proposal after I sever my ties with the company if you are still interested. The idea is to give you insurance if the approach in Stirling did not pan out. Jan is contemplating a mechanism to give you the insurance with no risk on your part, if we do not perform (achieve set milestones) or if the Stirling group successfully managed the technical challenges, you can stop your interaction with minimal notice.

Please call me and lets solve this like we always do.

Victor

**From:** Manneh, Victor
**Sent:** Friday, November 11, 2005 6:46 PM
**To:** Leisenring, Steve
**Subject:** FW: Termination agreement
Steve

I sent this note to dave, waiting for a response

Victor

——Original Message——
**From:** Warner, Anne
**Sent:** Monday, November 14, 2005 4:41 PM
**To:** Manneh, Victor
**Cc:** Scott, Dave; Leisenring, Steve
**Subject:** Termination Agreement
**Importance:** High

This is to remind you that based on the final offer made to you by Dave Scott on October 26th (see attached email), you were given 21 days from the date of the offer to sign the severance agreement. The 21 days expires this Wednesday, November 16th. In the interests of administrative simplicity, we will extend your right to sign the letter to your date of termination,

which is Saturday, November 19th. If we receive a signed letter by that date, you will also have an additional 7 days in which you are permitted to revoke your signature, after which the agreement will be considered final, and you will receive your severance pay. If we do not receive a signed copy of the severance agreement by November 19th, your termination will be final, and no severance will be paid.

I understand that you are continuing discussions with Dave Scott with regards to the equipment that belongs to Inverness. Please note that the equipment is not part of the agreement as written, and it is my understanding at this point that Dave will consider whether to enter into further discussions on this issue once the termination issues are resolved.


Anne

Anne Warner
General Counsel, Professional Diagnostics & Cardiac
(VP Regulatory, Acting)
Inverness Medical Innovations
51 Sawyer Road, Waltham MA 02453
(direct line) 781 314 4173
(confidential fax) 781 314 4073 (please email ahead)
anne.warner@invmed.com


**From:** Manneh, Victor
**Sent:** Monday, November 14, 2005 2:04 PM
**To:** Scott, Dave
**Cc:** Leisenring, Steve; Warner, Anne
**Subject:** FW: Termination Agreement -

**Importance: High**
Dave,

I sent you a note on November 10, 2005 stating the reasons why I cannot accept this severance agreement. I did not get an answer from you, even though I have called a left several messages; instead I received a note from Anne Warner in it she ignored my letter to you.

I am restating that I cannot sign this severance agreement as is, especially since the proposed agreement expressly references a release of all claims and there are still unresolved issues, including my stock options, the equipments...etc. If the equipment for example is not addressed I could found to have waived any claims to it. We need to introduce a language on by signing the severance I would not release my rights to the equipments and my shares.

I am trying to be reasonable but cannot get anything done if no one will speak with me.

I am hoping to resolve this peacefully, find a way to negotiate our way out of this mess and a resolution to move forward.

Victor


11.15.05-11.16.05

43

*Exhibit* 7    Page 67

October 26, 2005

Victor Manneh
11686 Carmel Creek Rd. #107
San Diego, CA 92130

Dear Victor:

As more fully set forth below, Innovations Research, LLC (together with its parent and affiliated companies collectively, the "Company") desires to provide you with severance pay in exchange for certain agreements by you. This letter confirms the termination of your employment with the Company, effective as of the close of business day on November 19, 2005 (the "Separation Date"). The following information is provided to assist you with your transition and includes the Company's offer of severance contingent on your execution of this Severance Letter Agreement.

1.    Severance Pay.  Subject to your execution of this Agreement, which includes a standard release of claims, and in exchange for the other mutual promises set forth in this letter, as soon as practical following the effective date of the Agreement as described in Section 7, the Company agrees to provide you with the following severance pay (the "Severance Pay"):

(i)    A lump sum payment in the amount of $50,000, less all required local, state, federal and other employment-related taxes and deductions, which sum represents four (4) months and eight 8 days of your current base salary of $140,000.

You acknowledge and agree that the Severance Pay to be provided to you is not intended to, and shall not constitute, a severance plan, and shall confer no benefit on anyone other than the parties hereto. You further acknowledge that you have been paid and provided all wages, commissions, bonuses, vacation pay, holiday pay and any other form of compensation that may be due to you now or which would have become due in the future in connection with your employment with or separation of employment from the Company.  Except as set forth in this letter, the Company has previously paid all salary, vacation accrual and bonus to which you are entitled through the Separation Date under all other compensation or reimbursement arrangements. From and after the Separation Date, you shall have no right to compensation or benefits beyond those specifically provided for in this Agreement.

2.    Additional Benefits.  The additional benefits will be provided to you regardless of whether you sign this Severance Agreement:

(i)    Your final paycheck for services performed through the Separation Date, in the total amount of $_____, less applicable withholdings and deductions ((Note: Final amount to be added by Steve Leisenring))

1

*(ii)*     Payment for your vacation time accrued but unused through the Separation Date in the amount of $_____, less applicable withholdings and deductions. *((Note: Final amount to be added by Steve Leisenring))*

*(iii)*     Payment for any expenses incurred in the ordinary course of business and consistent with the Company's expense reimbursement policies for which you can produce receipts that were accrued within the ninety day period prior to your Separation Date.

*(iv)*     Benefits as following the company plan and company schedule relating to the roll-over of any 401-K plan and life insurance.

*(v)*     The following stock option benefits:

    *(a)*     As previously approved by the Board of Directors of Inverness Medical Innovations, Inc., you have been issued nonqualified stock options to purchase 30,000 shares of the common stock of Inverness Medical Innovations, Inc., 22,500 of which will be vested as of your Separation Date and will remain exercisable for three months thereafter in accordance with the terms of the 2001 Stock Option and Incentive Plan and your Non-Qualified Stock Option Agreement.

    *(b)*     The previously issued nonqualified stock options to purchase 5,000 shares of the common stock of the Inverness Medical Innovations, Inc., 2,500 of which will be vested as of your Separation Date and will remain exercisable for twelve months thereafter in accordance with the terms of the 2001 Stock Option and Incentive Plan and your Non-Qualified Stock Option Agreement.

*(v)*     Upon termination, you are eligible to continue your current health and dental benefits through COBRA. Participation is voluntary. Under COBRA, you can maintain your health and/or dental insurance(s) for up to eighteen (18) months following the Separation Date. You will be responsible for the full cost of the insurance coverage should you wish to continue. Please note that these benefits are subject to periodic review and revision by the Company. This means that if the Company's rates change during the COBRA period, you will be responsible for any increases. You acknowledge that with this letter you have received details concerning your rights under COBRA.

Further, you will be paid for any outstanding expenses reimbursable under Company policy upon receipt and approval of an appropriate expense report.

**3.     Covenants by You.** You expressly acknowledge and agree to the following:

*(i)*     You will have returned all Company property, including but not limited to your office keys, laptop computer, Company documents and files, and any other computer hardware, disks or files in your possession, custody or control, whether maintained by you at work or off-site, before the Separation Date. You further acknowledge that you will

2

*Exhibit A     Page 69*

have retrieved from the Company as of the date of termination all of your personal effects;

(ii)    that you will abide by the Company's Nondisclosure, Nonsolicitation and Developments Agreement you entered into, the terms of which are hereby incorporated by reference, and that you will abide by any and all common law and/or statutory obligations relating to protection and non-disclosure of the Company's trade secrets and/or confidential and proprietary documents and information;

(iii)    that you confirm that any and all discoveries, inventions, ideas, concepts, processes, products, methods and improvements, or parts thereof, conceived, developed, or otherwise made by you, alone or jointly with others and in any way relating to the Company's present or proposed products, programs or services or to tasks assigned to you during the course of your employment, whether or not subject to copyright or patent protection and whether or not reduced to tangible form or reduced to practice, during the period of your employment with the Company, whether or not made during your regular working hours or on the Company's premises (collectively referred to herein as "Developments") belong to and are the sole property of the Company and have been assigned to the Company. You further confirm that all such Developments constitute works made for hire under the copyright laws of the United States and that the assignments to the Company were for all of your right, title and interest in such Developments and in all copyrights, patents, reproduction and other proprietary rights you may have had in any such Developments, together with the right to file for or own wholly without restriction United States and foreign patents, trademarks and copyrights with respect thereto;

(iv)    that all information relating in any way to this Agreement, including the terms and amount of financial consideration provided for in this Agreement, shall be held confidential by you and shall not be publicized or disclosed to any person (other than an immediate family member, legal counsel or financial advisor, provided that any such individual to whom disclosure is made agrees to be bound by these confidentiality obligations), business entity or government agency (except as mandated by law);

(v)    that you will not make any statements that are professionally or personally disparaging about, or adverse to, the interests of the Company (and its officers, directors and managers) including, but not limited to, any statements that disparage any such person, product, service, finances, financial condition, capability or any other aspect of the business of the Company, and that you will not engage in any conduct which is intended to harm professionally or personally the reputation of the Company and/or its officers, directors and managers;

(vi)    that you will not counsel or assist any attorneys or their clients in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints by any third party against the Company and/or any officer, director, employee, agent, representative, shareholder or attorney of the Company, unless under a subpoena or other court order to do so; and

3

(vii)    that the breach of any of the foregoing covenants by you shall constitute a material breach of this Agreement and shall relieve the Company of any further obligations hereunder and, in addition to any other legal or equitable remedy available to the Company, shall entitle the Company to recover any Severance Pay already paid to you pursuant to Section 1 of this letter.

4.    Release of Claims.

(i)    You hereby agree and acknowledge that by signing this Agreement and accepting the Severance Pay discussed in Section 1 and other good and valuable consideration, you are waiving your right to assert any and all forms of legal Claims against the Company[1] of any kind whatsoever, arising from the beginning of time through the date you execute this Agreement. With the sole and limited exceptions set forth in paragraph (ii) below, for purposes of this Section 4 the words "Claim" and "Claims" are intended to be as broad as the law allows and to mean: any and all charges, complaints and other form of action against the Company, seeking any form of relief including, without limitation, equitable relief (whether declaratory, injunctive or otherwise), the recovery of any damages, or any other form of monetary recovery whatsoever (including, without limitation, back pay, front pay, compensatory damages, emotional distress damages, punitive damages, attorney's fees and any other costs) against the Company, including, without limitation:

(a)    Claims under any California (or any other state) or federal discrimination, fair employment practices or other employment related statute, regulation or executive order (as they may have been amended through the date you sign this Agreement), including the federal Age Discrimination Employment Act;

(b)    Claims under any other California (or any other state) or federal employment related statute, regulation or executive order (as they may have been amended through the date you sign this Agreement);

(c)    Claims under any California (or any other state) or federal common law theory;

(d)    Any other Claims arising under other state or federal law.

In furtherance of this intention, each party hereto expressly waives any rights or benefits conferred by the provisions of Section 1542 of the Civil Code of the State of California, which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

---

[1]    For purposes of this Section, the term "Company" includes Inverness Medical Innovations, Inc. and any of its divisions, affiliates (which means all persons and entities directly or indirectly controlling, controlled by or under common control with Inverness), parents, subsidiaries and all other related entities, and its and their directors, officers, employees, trustees, agents, successors and assigns.

4

(ii)    Notwithstanding the foregoing, this Section 4 shall not release the Company from any obligation expressly set forth in this Agreement, and does not preclude you from filing a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), but you will not be entitled to any monetary or other relief from the EEOC or from any Court as a result of litigation brought on the basis of or in connection with such charge.

(iii)    You expressly acknowledge and agree that, but for providing the foregoing release of Claims, you would not be receiving the Severance Pay being provided to you under the terms of this Agreement.

5.    **Entire Agreement/Choice of Law/Enforceability.** You acknowledge and agree that, with the exception of the Agreement identified in Section 3, this Agreement supersedes any and all prior or contemporaneous oral and/or written agreements between you and the Company, and sets forth the entire agreement between you and the Company. No variations or modifications hereof shall be deemed valid unless reduced to writing and signed by the parties hereto. This Agreement shall be deemed to have been made in the State of California, shall take effect as an instrument under seal within California, and shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflict of laws principles. The provisions of this letter are severable, and if for any reason any part hereof shall be found to be unenforceable, the remaining provisions shall be enforced in full.

6.    **Arbitration.** You and the Company agree that any and all disputes arising out of the terms of this Agreement, their interpretation, and any of the matters herein released, shall first be subject to mediation by a reputable third party mediator, agreed on by the parties. In the event of the failure of such mediation, the matter shall become subject to binding arbitration to the extent permitted by law, before the American Arbitration Association under its National Rules for the Resolution of Employment Disputes. The parties hereby waive their right to jury trial as to matters arising out of the terms of this Agreement and any matters herein released to the extent permitted by law. The Parties agree that the prevailing party in any arbitration shall be entitled to injunctive relief in any court of competent jurisdiction to enforce the arbitration award. Notwithstanding the foregoing, the Company may immediately seek injunctive relief in a court of competent jurisdiction for your violation of the restrictive covenants set forth in the Nondisclosure, Nonsolicitation and Developments Agreement between you and the Company.

7.    **Understanding this Agreement.** Before signing this Agreement, you should take whatever steps you believe are necessary to ensure that you understand what you are signing, what benefits you are receiving and what rights you are giving up.

(a)    Regardless of the date on which you sign this Agreement, you and the Company agree that your actual date of termination is November 19, 2005.

(b)    By signing this Agreement, you are acknowledging that you have read it carefully and understand all of its terms.

(c)    You understand and acknowledge that, if you do not sign this Agreement including the Release of Claims, you would not be receiving any Severance Pay.

5

(d)     You understand that, among other claims you are releasing in the Release of Claims, are any claims against the Company alleging discrimination on the basis of age.

(e)     You are hereby advised and encouraged to consult with legal counsel for the purpose of reviewing the terms of this Agreement.

(f)     You understand that the Severance Pay is provided in consideration of your obligations herein, including but not limited to Sections 3 and 4.

(g)     You are being given twenty-one (21) days in which to consider this Agreement and whether to accept this Agreement (which may be waived by signing and returning this Agreement prior to the expiration of the 21-day period). If you choose to accept this Agreement within that time, you are to sign and date below and return it to the Company, c/o Nava Duek, Inverness Medical, 51 Sawyer Road, Suite 200, Waltham, MA 02453.

(h)     Even after the execution of this Agreement, you will have an additional seven (7) days to revoke this Agreement. You should carefully consider all the terms of this Agreement during such period of time, and decide whether they are still applicable as of the date of execution. The Company will remain committed to the terms hereof during such seven (7) day period. The Agreement will not be effective or enforceable by you until this seven (7) day period has expired, and you specifically acknowledge that if you do not revoke this Agreement it shall be considered fully effective at the expiration of said period. In order to revoke your assent to this Agreement, you must, within seven (7) days after execution hereof, deliver a written notice of rescission to Nava Duek at the address noted above. To be effective, the notice of rescission must be hand delivered, or postmarked with the seven (7) day period and sent by certified mail, return receipt requested, to the referenced address.

Very truly yours,

By: _____
Dave Scott
Inverness Medical Innovations, Inc.

_____
Dated:

Confirmed and Agreed:

_____
Victor Manneh

Dated:

6

*Exhibit* _X_ Page 73

November 17, 2005

Victor Manneh
11686 Carmel Creek Rd. #107
San Diego, CA 92130

Dear Victor:

As more fully set forth below, Innovations Research, LLC (together with its parent and affiliated companies collectively, the "Company") desires to provide you with severance pay in exchange for certain agreements by you. This letter confirms the termination of your employment with the Company, effective as of the close of business day on November 19, 2005 (the "Separation Date"), pursuant to the notice provided to you on September 12th, 2005 by Steve Howell, as requested by Dave Scott. The following information is provided to assist you with your transition and includes the Company's offer of severance contingent on your execution of this Severance Letter Agreement.

1.    **Severance Pay.**  Subject to your execution of this Agreement, which includes a standard release of claims, and in exchange for the other mutual promises set forth in this letter, as soon as practical following the effective date of the Agreement as described in Section 7, the Company agrees to provide you with the following severance pay (the "Severance Pay"):

(i)    A lump sum payment in the amount of $50,000, less all required local, state, federal and other employment-related taxes and deductions, which sum represents four (4) months and eight 8 days of your current base salary of $140,000.

You acknowledge and agree that the Severance Pay to be provided to you is not intended to, and shall not constitute, a severance plan, and shall confer no benefit on anyone other than the parties hereto. You further acknowledge that you have been paid and provided all wages, commissions, bonuses, vacation pay, holiday pay and any other form of compensation that may be due to you now or which would have become due in the future in connection with your employment with or separation of employment from the Company. Except as set forth in this letter, the Company has previously paid all salary, vacation accrual and bonus to which you are entitled through the Separation Date under all other compensation or reimbursement arrangements. From and after the Separation Date, you shall have no right to compensation or benefits beyond those specifically provided for in this Agreement.

2.    **Additional Benefits.**  The additional benefits will be provided to you regardless of whether you sign this Severance Agreement:

(i)    Your final paycheck for services performed through the Separation Date, in the total amount of $5,384.62, less applicable withholdings and deductions, which

1

**EXHIBIT 7**

represents your salary up until the Separation Date, plus $8,615.38 in lieu of salary for the period between the Separation Date until December 12th (the end of the three month notice period dating from September 12, 2005.)

(ii)    Payment for your vacation time accrued but unused through December 12, 2005 in the amount of $11,433.00, less applicable withholdings and deductions.

(iii)   Payment for any expenses incurred in the ordinary course of business and consistent with the Company's expense reimbursement policies for which you can produce receipts that were accrued within the ninety day period prior to your Separation Date.

(iv)    Benefits as following the company plan and company schedule relating to the roll-over of any 401-K plan and life insurance.

(v)     The following stock option benefits:

   (a)    As previously approved by the Board of Directors of Inverness Medical Innovations, Inc., you have been issued nonqualified stock options to purchase 30,000 shares of the common stock of Inverness Medical Innovations, Inc., 22,500 of which will be vested as of your Separation Date and will remain exercisable for three months thereafter in accordance with the terms of the 2001 Stock Option and Incentive Plan and your Non-Qualified Stock Option Agreement.

   (b)    The previously issued nonqualified stock options to purchase 5,000 shares of the common stock of the Inverness Medical Innovations, Inc., 2,500 of which will be vested as of your Separation Date and will remain exercisable for twelve months thereafter in accordance with the terms of the 2001 Stock Option and Incentive Plan and your Non-Qualified Stock Option Agreement.

(v)     Upon termination, you are eligible to continue your current health and dental benefits through COBRA. Participation is voluntary. Under COBRA, you can maintain your health and/or dental insurance(s) for up to eighteen (18) months following the Separation Date. You will be responsible for the full cost of the insurance coverage should you wish to continue. Please note that these benefits are subject to periodic review and revision by the Company. This means that if the Company's rates change during the COBRA period, you will be responsible for any increases. You acknowledge that with this letter you have received details concerning your rights under COBRA.

Further, you will be paid for any outstanding expenses reimbursable under Company policy upon receipt and approval of an appropriate expense report.

3.      **Covenants by You.** You expressly acknowledge and agree to the following:

2

(i)     You will have returned all Company property, including but not limited to your office keys, laptop computer, Company documents and files, and any other computer hardware, disks or files in your possession, custody or control, whether maintained by you at work or off-site, before the Separation Date. You further acknowledge that you will have retrieved from the Company as of the date of termination all of your personal effects;

(ii)    that you will abide by the Company's Nondisclosure, Nonsolicitation and Developments Agreement you entered into, the terms of which are hereby incorporated by reference, and that you will abide by any and all common law and/or statutory obligations relating to protection and non-disclosure of the Company's trade secrets and/or confidential and proprietary documents and information;

(iii)   that you confirm that any and all discoveries, inventions, ideas, concepts, processes, products, methods and improvements, or parts thereof, conceived, developed, or otherwise made by you, alone or jointly with others and in any way relating to the Company's present or proposed products, programs or services or to tasks assigned to you during the course of your employment, whether or not subject to copyright or patent protection and whether or not reduced to tangible form or reduced to practice, during the period of your employment with the Company, whether or not made during your regular working hours or on the Company's premises (collectively referred to herein as "Developments") belong to and are the sole property of the Company and have been assigned to the Company. You further confirm that all such Developments constitute works made for hire under the copyright laws of the United States and that the assignments to the Company were for all of your right, title and interest in such Developments and in all copyrights, patents, reproduction and other proprietary rights you may have had in any such Developments, together with the right to file for or own wholly without restriction United States and foreign patents, trademarks and copyrights with respect thereto;

(iv)    that all information relating in any way to this Agreement, including the terms and amount of financial consideration provided for in this Agreement, shall be held confidential by you and shall not be publicized or disclosed to any person (other than an immediate family member, legal counsel or financial advisor, provided that any such individual to whom disclosure is made agrees to be bound by these confidentiality obligations), business entity or government agency (except as mandated by law);

(v)     that you will not make any statements that are professionally or personally disparaging about, or adverse to, the interests of the Company (and its officers, directors and managers) including, but not limited to, any statements that disparage any such person, product, service, finances, financial condition, capability or any other aspect of the business of the Company, and that you will not engage in any conduct which is intended to harm professionally or personally the reputation of the Company and/or its officers, directors and managers;

(vi)   that you will not counsel or assist any attorneys or their clients in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints by any third party against the Company and/or any officer, director, employee, agent, representative, shareholder or attorney of the Company, unless under a subpoena or other court order to do so; and

(vii)   that the breach of any of the foregoing covenants by you shall constitute a material breach of this Agreement and shall relieve the Company of any further obligations hereunder and, in addition to any other legal or equitable remedy available to the Company, shall entitle the Company to recover any Severance Pay already paid to you pursuant to Section 1 of this letter.

4.   **Release of Claims.**

(i)   You hereby agree and acknowledge that by signing this Agreement and accepting the Severance Pay discussed in Section 1 and other good and valuable consideration, you are waiving your right to assert any and all forms of legal Claims against the Company¹ of any kind whatsoever, arising from the beginning of time through the date you execute this Agreement. With the sole and limited exceptions set forth in paragraph (ii) below, for purposes of this Section 4 the words "Claim" and "Claims" are intended to be as broad as the law allows and to mean: any and all charges, complaints and other form of action against the Company, seeking any form of relief including, without limitation, equitable relief (whether declaratory, injunctive or otherwise), the recovery of any damages, or any other form of monetary recovery whatsoever (including, without limitation, back pay, front pay, compensatory damages, emotional distress damages, punitive damages, attorney's fees and any other costs) against the Company, including, without limitation:

(a)   Claims under any California (or any other state) or federal discrimination, fair employment practices or other employment related statute, regulation or executive order (as they may have been amended through the date you sign this Agreement), including the federal Age Discrimination Employment Act;

(b)   Claims under any other California (or any other state) or federal employment related statute, regulation or executive order (as they may have been amended through the date you sign this Agreement);

(c)   Claims under any California (or any other state) or federal common law theory;

(d)   Any other Claims arising under other state or federal law.

---

¹   For purposes of this Section, the term "Company" includes Inverness Medical Innovations, Inc. and any of its divisions, affiliates (which means all persons and entities directly or indirectly controlling, controlled by or under common control with Inverness), parents, subsidiaries and all other related entities, and its and their directors, officers, employees, trustees, agents, successors and assigns.

4

In furtherance of this intention, each party hereto expressly waives any rights or benefits conferred by the provisions of Section 1542 of the Civil Code of the State of California, which provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

(ii)    Notwithstanding the foregoing, this Section 4 shall not release the Company from any obligation expressly set forth in this Agreement, and does not preclude you from filing a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), but you will not be entitled to any monetary or other relief from the EEOC or from any Court as a result of litigation brought on the basis of or in connection with such charge.

(iii)    You expressly acknowledge and agree that, but for providing the foregoing release of Claims, you would not be receiving the Severance Pay being provided to you under the terms of this Agreement.

5.    **Entire Agreement/Choice of Law/Enforceability.** You acknowledge and agree that, with the exception of the Agreement identified in Section 3, this Agreement supersedes any and all prior or contemporaneous oral and/or written agreements between you and the Company, and sets forth the entire agreement between you and the Company. No variations or modifications hereof shall be deemed valid unless reduced to writing and signed by the parties hereto. This Agreement shall be deemed to have been made in the State of California, shall take effect as an instrument under seal within California, and shall be governed by and construed in accordance with the laws of the State of California, without giving effect to conflict of laws principles. The provisions of this letter are severable, and if for any reason any part hereof shall be found to be unenforceable, the remaining provisions shall be enforced in full.

6.    **Arbitration.** You and the Company agree that any and all disputes arising out of the terms of this Agreement, their interpretation, and any of the matters herein released, shall first be subject to mediation by a reputable third party mediator, agreed on by the parties. In the event of the failure of such mediation, the matter shall become subject to binding arbitration to the extent permitted by law, before the American Arbitration Association under its National Rules for the Resolution of Employment Disputes. The parties hereby waive their right to jury trial as to matters arising out of the terms of this Agreement and any matters herein released to the extent permitted by law. The Parties agree that the prevailing party in any arbitration shall be entitled to injunctive relief in any court of competent jurisdiction to enforce the arbitration award. Notwithstanding the foregoing, the Company may immediately seek injunctive relief in a court of competent jurisdiction for your violation of the restrictive covenants set forth in the Nondisclosure, Nonsolicitation and Developments Agreement between you and the Company.

7.    **Understanding this Agreement.** Before signing this Agreement, you should take whatever steps you believe are necessary to ensure that you understand what you are signing, what benefits you are receiving and what rights you are giving up.

5

(a)    Regardless of the date on which you sign this Agreement, you and the Company agree that your actual date of termination is November 19, 2005.

(b)    By signing this Agreement, you are acknowledging that you have read it carefully and understand all of its terms.

(c)    You understand and acknowledge that, if you do not sign this Agreement including the Release of Claims, you would not be receiving any Severance Pay.

(d)    You understand that, among other claims you are releasing in the Release of Claims, are any claims against the Company alleging discrimination on the basis of age.

(e)    You are hereby advised and encouraged to consult with legal counsel for the purpose of reviewing the terms of this Agreement.

(f)    You understand that the Severance Pay is provided in consideration of your obligations herein, including but not limited to Sections 3 and 4.

(g)    You are being given twenty-one (21) days in which to consider this Agreement and whether to accept this Agreement (which may be waived by signing and returning this Agreement prior to the expiration of the 21-day period). If you choose to accept this Agreement within that time, you are to sign and date below and return it to the Company, c/o Nava Duek, Inverness Medical, 51 Sawyer Road, Suite 200, Waltham, MA 02453.

(h)    Even after the execution of this Agreement, you will have an additional seven (7) days to revoke this Agreement. You should carefully consider all the terms of this Agreement during such period of time, and decide whether they are still applicable as of the date of execution. The Company will remain committed to the terms hereof during such seven (7) day period. The Agreement will not be effective or enforceable by you until this seven (7) day period has expired, and you specifically acknowledge that if you do not revoke this Agreement it shall be considered fully effective at the expiration of said period. In order to revoke your assent to this Agreement, you must, within seven (7) days after execution hereof, deliver a written notice of rescission to Nava Duek at the address noted above. To be effective, the notice of rescission must be hand delivered, or postmarked with the seven (7) day period and sent by certified mail, return receipt requested, to the referenced address.

Very truly yours,

By: _____
Dave Scott
Inverness Medical Innovations, Inc.

Dated:

6

**EXHIBIT A**