1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   VICTOR MANNEH,                              CASE NO. 08cv653 WQH (AJB)

12                              Plaintiff,       ORDER
              vs.
13   IVERNESS MEDICAL INNOVATIONS,
     INC., et al.,
14
                              Defendants.
15

16
     HAYES, Judge:
17
            The matter before the court is Defendant's Motion for Summary Judgment or in the
18
     Alternative, Partial Summary Judgment.  (Doc. # 24).
19
                                     **BACKGROUND**
20
            Plaintiff Victor Manneh, a scientist, filed this action against his former employer
21
     Defendants Iverness Medical Innovations, Inc. and Innovations Research, LLC (collectively
22
     "Iverness"); David Scott, an employee of Iverness; and Does 1-50, in the Superior Court of the
23
     State of California for the County of San Diego.   (Doc. # 1).  Plaintiff alleges the following
24
     claims: (1) recision of his severance agreement; (2) declaratory relief that the severance
25
     agreement does not waive Plaintiff's claims; (3) breach of an agreement to transfer laboratory
26
     equipment to Plaintiff; (4) a common count for the reasonable value of Plaintiff's services;
27
     (5) intentional misrepresentation; (6) negligent misrepresentation; (7) breach of Plaintiff's
28
     employment contract; and (8) intentional interference with economic advantage.  *Id.*  Plaintiff

seeks to recover damages for the value of the laboratory equipment he did not receive, or alternatively, for the reasonable value of the services he performed in exchange for the equipment; for the lost profits caused by a delay in opening his own business when he did not receive the equipment; for the value of an option to purchase 7,500 shares of stock he did not receive; for not being named as an inventor on a patent; and for a business opportunity he lost because he did not receive the equipment. *Id.* On April 10, 2008, Defendants filed a Notice of Removal removing the case to federal court.  *Id.*  On June 15, 2009, Defendants moved for summary judgment, or in the alternative, partial summary judgment.  (Doc. # 24).

**FACTS**

**I.      Plaintiff's Employment Agreement and Stock Option Agreements**

Plaintiff was a scientist living in San Diego when Iverness recruited him to move to Bedford, England to start and run a cardiovascular research team.  (Doc. # 24, Ex. 2, Manneh Depo. at 10-18[1]).  Plaintiff was initially reluctant to leave San Diego and told Defendant David Scott, the Chief Scientific Officer for Iverness, that he would not do so unless he received stock options in Iverness.  *Id.* at 77-79.  On October 2, 2002, Plaintiff signed an "Employment Agreement" which laid out the terms of his employment with Iverness.  (Doc. # 24, Ex. 4, Employment Agreement at 80-92).  The Employment Agreement set Plaintiff's annual compensation at $140,000 and included a stock option provision that granted Plaintiff 30,000 shares of stock at $10.85 "vesting in three equal installments of 10,000 options on the date of the anniversary of the date of issue."  *Id.* at 80.  The Employment Agreement stated that Plaintiff was not eligible for a bonus.  *Id.*  The Employment Agreement stated that Plaintiff's "normal working hours shall be 37.5 hours per week, Monday to Friday with a ½ hour for lunch, but you may be expected to work additional hours as required by the Company and you are required to be flexible in the hours that you work."  *Id.* at 81.

The employment agreement required three months' written notice if either party wished

---

[1]Citations are to the page numbers in the bottom right hand corner of the exhibits filed with Defendant's Motion for Summary Judgment.

to terminate the employment. *Id.* The notice period was waivable by either party, and a provision stated "[a]t the discretion of the employer, a payment in lieu of notice may be given." *Id.* The employment agreement also governed the rights to intellectual property Plaintiff created while employed by Defendant Iverness. *Id.* at 84. When Plaintiff was acting as an employee in the United States, United States law applied and  when he was acting as an employee in the United Kingdom, English law applied. *Id.* at 84-85. In the section under United States law, the agreement stated that all intellectual property "shall belong to and be the absolute property of the Company or such associated Company or third party as the Company may deem appropriate, subject to your statutory rights as inventor." *Id.* at 84.

Plaintiff relocated to Bedford, England in January of 2003 . (Doc. # 24, Ex. 2, Manneh Depo. at 25-26). Upon arriving in Bedford, Plaintiff was presented with a "Non-Qualified Stock Option Agreement for Employees" which contradicted the Employment Agreement and stated that the stock would vest over a four-year period with four equal installments of 7,500 shares vesting each year. (Doc. # 24, Ex. 11, January 15, 2003 Stock Option Agreement at 106-110). Plaintiff discussed the discrepancy with Scott on January 15, 2003. (Doc. 24, Ex. 2, Manneh Depo. at 17-21). Scott told Plaintiff there had been a mistake in Plaintiff's original Employment Agreement because the three-year vesting period was against Iverness's company policy. (Doc. # 24, Ex. 4, Employment Agreement at 80-89; Doc. 24, Ex. 2, Manneh Depo. at 17-21; Doc. # 24 at 20). Plaintiff states in his declaration that in addition to Scott, he also spoke with "two other Iverness officers and directors, Jerry McAleer and Paul Hempel, about this discrepancy." (Doc. 32-3, Manneh Declaration at 3, ¶7). McAleer told Plaintiff that Iverness "does not give three-year vestings on stock options as a matter of company policy." *Id.*

Plaintiff states in his declaration that Scott replied that he would "find a way to fix [the] mistake if it becomes a problem later, that is, if my employment was terminated before four years." *Id.* at ¶8. Plaintiff states that "[i]n reliance on this promise, I signed the stock option agreement (with the incorrect four-year vesting)." *Id.* In March or April of 2003, an additional 5,000 shares of stock with a four-year vesting period were issued to Plaintiff. *Id.* at ¶ 9; Doc.

# 24, Ex. 12.  This second set of options could be exercised at $16.23 per share.  (Doc. # 32-3, Manneh Declaration  at 3, ¶9).  Plaintiff states that the second stock option agreement was "a performance bonus" for introducing "several technologies for developing high sensitivity protein assays."  (Doc. # 32-3, Manneh Declaration  at 3, ¶ 9).  Plaintiff states that in early 2007, he looked at reported compensation packages on Defendant Iverness's website and learned that "both Scott and McAleer had stock options plans, as of 2001, that had three year vestings."  *Id.* at ¶ 40; Doc. 32-4, Ex. 21.

## II.     End of Plaintiff's Employment and Transfer of Equipment

In August of 2003, Plaintiff returned to San Diego "temporarily . . . for personal reasons."  *Id.* at ¶10.  At around the same time, Iverness acquired Genicon, a company in San Diego.  *Id.*  Defendant Scott and Plaintiff discussed relocating Plaintiff's job to San Diego.  *Id.*  The parties agreed that Plaintiff would "start up, staff and manage a research and development laboratory in San Diego for Iverness to continue the work on the cardiology meter project."  *Id.*  Defendant Innovations Research was formed in January 2004 "as an Iverness subsidiary to own and operate the new San Diego research and development laboratory."  *Id.*  Plaintiff worked in San Diego for approximately two years before Scott asked whether he would be willing to relocate to Scotland.  *Id.* at ¶¶ 13-15; Doc. #24, Manneh Depo. at 80-81.  Scott told Plaintiff that Iverness was relocating its research and development facilities and would be closing down the San Diego laboratory.  *Id.*  Plaintiff was not willing to relocate but suggested that he could instead start his own laboratory and work collaboratively with Iverness on future projects. *Id.*

At a meeting in London, England on July 29, 2005, Scott told Plaintiff that scientists at the Scotland facility were "working on a new electrochemical platform for the cardiology meter project" and that the team needed certain chemical reagents made.   (Doc. # 32-3, Manneh Declaration  at 5, ¶14).  Scott had wanted Plaintiff to relocate to Scotland to oversee this project, but Plaintiff suggested that he would do the work in San Diego on an expedited schedule in exchange for the equipment in the Innovations laboratory in San Diego.  (Doc. # 32-3, Manneh Declaration  at 5, ¶16).  Plaintiff states that he and Scott discussed the

"extraordinary effort" which would be required to complete the reagent project on top of winding down the business of the Innovations laboratory. *Id.* at ¶ 16.  Plaintiff states that Iverness "didn't have the expertise to do what they needed to do" at the Scotland office without his assistance, and his efforts were "valuable work they really badly needed." (Doc. 24, Ex. 2, Manneh Depo. at 83-84).  Plaintiff states that Scott told him to begin work immediately and that a team would come to San Diego from England "to work out the details to implement the deal" for the laboratory equipment. (Doc. # 32-3, Manneh Declaration at 5, ¶16).  Plaintiff states that he would have looked for a new job instead of immediately commencing work on the reagents if Scott had not made that statement.  *Id.*  Plaintiff estimates that  creating the reagents would normally take about six months of work.  *Id.*  However, Plaintiff agreed to create the reagents for delivery by October 31, 2005, when the San Diego laboratory was scheduled to close.  *Id.* at ¶¶ 16, 18, 21.  Plaintiff states he also discussed the problem with his stock options with Scott and that he told Scott "that since I was leaving Iverness after three years, before the four-year vesting for the 7,500 share balance of the 30,000 shares, the four-year vesting had become a problem." *Id.* In response "Scott assured me again he (Scott) would fix his earlier mistake." *Id.*

On August 9, 2005, Plaintiff met with three Iverness employees in San Diego to discuss the "specifics of manufacturing the reagents and the possible timing for completion." *Id.* at ¶19.  One of the employees, Oliver Davies, said the timeline would normally be six months, an assessment that Plaintiff and the other meeting participants shared.  *Id.*  However, all "agreed that the work had to be completed sooner." *Id.*  Plaintiff states that he needed special equipment to manufacture the reagents, including a Malvern particle sizer, which he was authorized to purchase in late September.  *Id.*

Plaintiff states in his deposition that he and Iverness employees continued to work out the details of the  agreement to produce the reagents in exchange for the equipment from July 29, 2005 to September 12, 2005, when he met with Steve Howell, Andrew Gill, and David Lang, three Iverness employees from the United Kingdom,  in San Diego. *Id;* Doc. #24, Ex. 2, Manneh Depo. at 85-86.  Plaintiff characterizes this meeting as "final discussions" of the

laboratory equipment agreement.  (Doc. # 32-3, Manneh Declaration at 6, ¶ 20).  These final discussions concerned two items of equipment which would not be included in the exchange for the reagents (one machine from the Innovations laboratory and the new particle sizer) and a possible $100,000 payment by Iverness to get Plaintiff's new business started.  *Id.* at ¶ 21.  Plaintiff states that whether his new business would "do future work for Iverness was to be discussed between Scott or Howell and me" at some point in the future.  *Id.*

On September 12, 2005, Plaintiff received an email from Anne Warner, Iverness's general counsel.  *Id.* at ¶ 24.  The email stated that to  "wind[] down Innovations Research . . . the following needs to be done: 1) We need a copy of the lease in order to figure out how to terminate it or to transfer it to you if you intend to keep the same space.  2) You need to decide the date on which you will provide notice to the current five (?) employees . . . .  3) We will draft a separate severance letter for you, referring to the terms of your employment agreement.  It is still my understanding that you were given notice on July 29th by Dave . . . .  4) Your severance letter will also contain the agreement about the handover of certain equipment if you hit the milestones to be defined by Steve Howell this week.  I suggest to you that you set up a corporation between now and the close-down to transfer the equipment into."  (Doc. 32-4, Ex. 15, at 193).  Plaintiff replied by email that Warner was incorrect about the status of termination notices and about the agreement, and stated "Please in the future be sure of our status before announcing termination notices as you are not familiar with my discussions with Dave Scott, Olly Davis and Steve Howell.  Please read my contract or ask Katie Garret to read it.  We are discussing the transfer activity so both the Stirling group and Innovations Research or the new entity will mutually benefit." *Id.* at 194.[2]

On September 16, 2005, Plaintiff circulated meeting minutes for the September 12, 2009 meeting with Howell, Gill, and Lang via email to the three other meeting participants and to Steve Leisenring, who "was coordinating a lot of the money wise and the activities with

---

[2]The header of the email is not included in the exhibit, so it is not clear when exactly the email was sent.  It appears to have been sent between September 12, 2005 when Anne Warner wrote her initial email to Plaintiff, and September 20, 2005, when Warner sent an email that appears to respond to this email. *Id.* at 194, 195.

Iverness." (Doc. 24, Ex. 2, Manneh Depo. at 63-64).  Plaintiff states the email "recorded what was agreed to" at the meeting (Doc. 32-3, Manneh Declaration at 6, ¶ 20)  and allowed all participants to "put comments on my version of the meeting minutes."  (Doc. 24, Ex. 2, Manneh Depo. at 65-66).  Plaintiff's email states: "Summarized the meeting minutes.  Will distribute Monday [S]an Diego time with your comments" (Doc. 24, Ex. 5, at 93).  The meeting minutes are attached to the email as a PDF file.  *Id.*  The minutes list the meeting attendees and describe what was discussed at the meeting, laying out the progress Plaintiff had made on the reagent project, the work still to be done, and the completion date: "Final shipment of these reagents will be completed by October 31, 2005." *Id.* at 94-95.  Finally, under the heading "AGREEMENTS,"  three sets of bullet points are listed:

**AGREEMENTS**
**Upon delivery of the agreed reagents IR is to receive:**
- All IR equipment except for the RLS View Genicon Instrument
- $100,000 payment upon approval
- Upon evaluation of reagents and decision to pursue electrochemical approach, SMI[3] will contract for additional reagents and development work

**Issues that need further discussion with Dave Scott or Steve Howell (or SMI representative):**
- IR's new Entity and its freedom to operate: Freedom to operate on platforms that IR patented and future ideas including but not limited to a homogenous assay and micro fluidics
- Ownership of IP generated from production of GOD reagents
- Possibility of first right of refusal to Iverness Medical on newly developed platform by the new entity

**Issues to be discussed with Dave Scott:**
> Discussions on closure of IR on October 31 and the options for employees of either transfer to SMI or accept a severance package that is to be negotiated.  Negotiations regarding severance will take place immediately but is not part of the activity between SMI and IR.

---

[3] "SMI" is Iverness's company running the laboratory in Scotland.

1  *Id.* at 96.

2      David Lang and Andrew Gill responded to Plaintiff's email. David Lang stated: "I want

3  to clarify three items:" (1) "Equipment that will be shipped to SMI is the Genicon (value circa

4  $47K) and the Malvern Particle (value circa $17K);" (2) "The $100K good will gesture has not

5  in any way been agreed yet. As discussed with you, Steve and I have to get together with Rob

6  Hutchinson and put this proposal to him. It has not yet been agreed.;" and (3) "Wording on

7  your last item should be that 'SMI <u>may</u> contract for additional reagents.' Again, there can be

8  no guarantee here." *Id.* Andrew Gill's response offers corrections to Manneh's minutes about

9  technical aspects of the reagent preparation and concludes with "Otherwise the minutes seem

10  to be a very good summary." *Id.* at 97-98.

11      On September 20, 2005, Anne Warner sent Plaintiff an email which stated that she

12  spoke with Dave Scott, who confirmed "delegat[ing] the authority to follow through with the

13  termination and to negotiate a possible deal for an ongoing relationship to Steve Howell." *Id.*

14  at 195. The email stated that Plaintiff received notice of his impending termination on

15  September 12, 2005 from Steve Howell and lists four matters which "we need to attend to . . .

16  on a go-forward basis–1. I have a copy of the lease for IR and need to know whether you

17  and/or your to-be-formed company will want to take it over . . . . 4. Steve Howell will continue

18  to work with you directly to determine whether an ongoing relationship makes sense, and if

19  so the terms of any such deal." *Id.*

20      On September 23, 2005, Plaintiff exchanged emails with Steve Howell concerning the

21  closing of Innovations and the equipment agreement. Steve Howell's email stated "[w]e have

22  discussed a proposal whereby you deliver reagents in return for equipment and cash to help

23  start your business. Anne is drafting a contract based on what we discussed–this proposal

24  needs to be approved by Corporate and then will be sent to you." *Id.* at 194. The email asked

25  Plaintiff to inform Warner whether he would continue the lease of the Innovations laboratory

26  space after Innovations closed. *Id.* Plaintiff's email to Howell includes Warner's September

27  12, 2005 email and "a summary of our agreements," which contains the "AGREEMENTS"

28  section of Plaintiff's September 12, 2009 meeting minutes. *Id;* Doc. 24, Ex. 8, at 103. Four

days later, on September 27, 2009, Plaintiff sent an email to Scott with a proposed agenda for a meeting in Waltham, Massachusetts on October 13, 2009.  (Doc. 24, Ex. 9, at 104;  Doc. # 32-3, Manneh Declaration  at 9, ¶ 27).  Plaintiff states in his declaration the meeting was to discuss "possible additional and future agreements" between Iverness and Plaintiff's new entity after Iverness's San Diego laboratory shut down. (Doc. # 32-3, Manneh Declaration at 9, ¶ 27).

Plaintiff states that "in reliance on the Equipment Agreement, from early-August through October 31, 2005, I worked approximately 70 hours per week, weekends included, nearly double the 37.5 hours per week required by my employment contract, to manufacture the reagents so this technology could be delivered to Scotland by October 31, 2005." *Id.* at ¶ 28. The reagents were completed and shipped to Scotland on October 24, 2005.  *Id.*

**III.   Severance Agreement**

On October 21, 2005, Plaintiff received the first draft of his severance agreement from Iverness.  *Id.* at ¶ 31; Doc. 24, Ex. 2, Manneh Depo. at 57.  This draft did not contain any reference to the equipment.  (Doc. # 32-3, Manneh Declaration at 11, ¶ 31).  Plaintiff states he complained to Scott and Warner, "who both promised to include it in a new draft of the severance agreement." *Id.*  The next draft of the severance agreement, sent October 25, 2005, stated that Iverness retained ownership of the equipment and would lease it to Plaintiff for $1 per month for three years and "exclusive, worldwide, perpetual, royalty free, sublicenseable license for use in the area of cardiology to all intellectual property rights in any and all inventions and/or developments . . . which are created by you or any of your employees or agents during the period of 3 years from the Separation Date." (Doc. # 24, Ex. 14 at 172-73). Plaintiff states that this arrangement "had never been discussed before" and that he complained again to Scott and Warner about the severance agreement.  (Doc. # 32-3, Manneh Declaration at 11, ¶¶ 32-33).

In response to Plaintiff's renewed complaints, Scott sent a third draft on October 26, 2005.  *Id.* This draft did not refer to the equipment but contained a general release of "any and all forms of legal Claims against the Company of any kind whatsoever arising from the beginning of time through the date you execute this Agreement." (Doc. # 32-4, Ex. 19).  The

draft also waived "any rights or benefits conferred by the provisions of Section 1542 of the Civil Code of the State of California which provides as follows: 'A general release does not extend to claims which the creditor does not know or suspect to exist in favor at the time of executing the release which if known by him must have materially affected his or her settlement with the debtor." *Id.*  Scott's email accompanying the third draft stated: "I've taken out any reference to the equipment.  We can discuss that separately after you decide on this." *Id.* at 211.  On November 14, 2005, Warner sent an email to Plaintiff which stated: "I understand that you are continuing discussions with Dave Scott with regards to the equipment that belongs to Iverness.  Please note that the equipment is not part of the agreement as written and it is my understanding at this point that Dave will consider whether to enter into further discussions on this issue once the termination issues are resolved." *Id.*, Ex. 20, at 217.

On November 10, 2005, Plaintiff sent an email to Scott stating that he could not "accept the Terms of the Separation sent October 26, 2005 . . . because once I sign it, I will be releasing all my claims towards the equipment and shares . . . ." (Doc. #24, Ex. 10).  On November 14, 2005, Plaintiff sent another email to Scott and Warner, which stated that he could not accept the severance because it "expressly references a release of all claims and there are still unresolved issues, including my stock options, the equipments[,] etc.  If the equipment for example is not addressed, I could be found to have waived any claims to it." *Id.*

On November 17, 2005, Scott sent a final version of the severance agreement, which contained an identical release provision to the October 26, 2005 version. *Id.*, Ex. 1, Doc. # 32-4, Ex. 19.  The severance agreement also contained a provision stating that all prior or contemporaneous oral or written agreements are superseded by the agreement and provided a $50,000 severance payment to Plaintiff. (Doc. # 24, Ex. 1).  Scott called Plaintiff to discuss the final version of the severance agreement on November 17, 2009 while Plaintiff was having lunch with Steve Leisenring, an Iverness employee in San Diego.  (Doc. 32-2, Manneh Declaration at 12-13, ¶ 36).  Plaintiff states he told Scott that he was uncomfortable with the new draft, but Scott assured him that the release of claims did not apply to the equipment or to the problem with Plaintiff's stock options. (Doc. # 32-3, Manneh Declaration at 12-13, ¶¶

36-37; Doc. # 24, Ex. 2, Manneh Depo.at 130).  Plaintiff states Scott said he was confirming "what he and Warner had previously presented to me verbally and in the October 26 and November 14 emails . . . these things were specifically excluded from the agreement . . . ." Plaintiff states that Scott told him he would "work something out that would correct the mistake about three-year versus four-year stock options vesting" and that the equipment now belonged to Plaintiff.  *Id.*  Plaintiff states that he signed the agreement in reliance on Scott's statements and would not have signed it if Scott had not made these statements. (Doc. # 32-3, Manneh Declaration at 12-13, ¶¶ 37).  Plaintiff states that Steve Leisenring also spoke with Scott, and that because Scott told Leisenring that they had worked out an agreement, Plaintiff kept one set of keys to the San Diego laboratory.  *Id.*

## IV.   Patents on Plaintiff's Inventions

Plaintiff states he discovered in the fall of 2005 that he is not listed on a patent for an Assay Invention which he worked on.  *Id.* at 14, ¶ 41.  Plaintiff attached a copy of the patent application "obtained from Google's Patent Service website" to the opposition as Exhibit 22. *Id.* at 32-4, Ex. 22.  The patent application, filed July 20, 2005,  lists Oliver Davies, David Lang, John Dilleen, Phillip Lowe, Steven Howell, and Christopher Slevin as inventors of "ASSAY DEVICE AND METHOD."  *Id.*  The invention is described in an abstract as an "assay device" which "includes a first reagent including a magnetic particle and a second reagent including detectable component."  *Id.*  A small graphic next to the abstract is illegible. *See id.*

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (quotation omitted).  "Once the moving party comes forward with sufficient evidence, the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citation omitted).

"In ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quotation omitted); *see also DiRuzza v. County of Tehama*, 206 F.3d 1304, 1314 (9th Cir. 2000) ("For purposes of summary judgment . . . , we must presume the facts to be those most favorable to the non-moving party."); *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999) (The nonmoving party's declaration or sworn testimony "is to be accepted as true . . . .  [The non-movant's] evidence should not be weighed against the evidence of the [movant].").  At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255; *see also Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1035-36 (9th Cir. 2005) ("The district court ... improperly dismissed Dominguez's allegations as consisting of nothing more than 'self-serving statements in her own deposition and affidavit.'  Such observations go to whether Dominguez is credible, a determination that is exclusively within the province of the factfinder at trial, not the district court on summary judgment . . . .").  "But the non-moving party must come forward with more than the mere existence of a scintilla of evidence.  Thus, 'where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Miller*, 454 F.3d at 988 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "Simply

because the facts are undisputed does not make summary judgment appropriate.  Instead, where divergent ultimate inferences may reasonably be drawn from the undisputed facts, summary judgment is improper." *Id.* (citation omitted).

## ANALYSIS

### I.      Release Clause of the Severance Agreement

Defendants contend the general  release clause in that agreement defeats all of Plaintiff's claims.   Plaintiff contends that the general release clause does not bar his claim because the contemporaneous emails by Defendants are a written alteration of the severance agreement, extrinsic evidence shows the clause was not intended to be a general release of all claims, and Plaintiff was fraudulently induced to sign the contract.   (Doc. # 32 at 18).  Defendants contend California law bars Plaintiff's evidence that Defendants induced him to sign the severance agreement by representing that the release would not apply to certain claims because it is a promise that contradicts the written contract. (Doc. # 24 at 12).

Defendants rely heavily on *Jefferson v. Department of Youth Authority*, 28 Cal. 4th 299, 305-306 (2002), which dealt with a general release clause in a contract between an employer and an employee.  The California Supreme Court concluded in *Jefferson* that general releases are enforceable, particularly where a releasor was aware of other claims at the time the release is executed.  *Id.*  However, *Jefferson* also explicitly requires the court to look to extrinsic evidence in determining the scope of the parties' intended release.  *Id.*

> [C]ourts have continued to adhere to the long-established general rule that—in the absence of fraud, deception, or similar abuse—a release of all claims covers claims that are not expressly enumerated in the release.  In these circumstances, of course, extrinsic evidence might establish that the release refers only to all claims *of a particular type*, and consideration of extrinsic evidence would be appropriate where—as here—the parties know of a particular claim but do not refer to it expressly in their release.

*Id.* at 305 (quotations and citations omitted).  A release waiving all claims known and unknown is only enforceable "absent contrary extrinsic evidence."  *Id.* at 310.  If "contrary extrinsic evidence" shows that the parties did not intend to waive all claims or that fraud, deception, or other "similar abuse" was involved in the transaction, the release is not enforceable. *Id.* at 305, 310.  While the court in *Jefferson* places the burden of excepting a known claim on the

employee signing the release, it allows an employee who has not excepted a known claim to show through extrinsic evidence that the scope of a general release was not intended to include the known claim. *Id.* at 305-306, 310.

Although the parties in the case were aware of Plaintiff's claims regarding the equipment and the stock options, these claims are not mentioned in the final version of the severance agreement. (Doc. # 32-4, Ex. 14). Both parties have presented extrinsic evidence regarding the scope of the release in the severance agreement. Plaintiff refused to sign the October 25, 2005 draft of the severance agreement which contained an explicit release of any claim to ownership of the equipment. (Doc. # 24, Ex. 14 at 172-73). Emails from Defendant Scott and Anne Warner, Iverness's general counsel, stated that the issue regarding the equipment would be solved "separately" and was the subject of "continuing discussions." (Doc. # 32-4, Ex. 19-20, at 211, 217). Plaintiff explained in his deposition that he was reluctant to sign the October 26, 2005 draft of severance which included the general release because he was concerned he was "releasing all my claims towards the equipment and [stock] shares." (Doc. # 24, Ex. 10). Plaintiff later signed the November 17, 2005 draft of the agreement which contained an identical general release provision, but explains in his declaration that he signed the agreement because of Defendant Scott's assurances that the general release did not apply to the equipment or the stock options agreement. (Doc. #32-3, Manneh Declaration at 12-13, ¶¶ 36-37). The Court concludes that the extrinsic evidence in the record raises a genuine issue of fact as to the scope of the release. A reasonable jury could find based on the extrinsic evidence that the release does not cover the equipment agreement or the stock options.

Plaintiff asserts, in the alternative, that he was fraudulently induced to sign the release by Defendants. (Doc. # 32 at 18-19). Plaintiff contends the statements of Defendant Scott and Anne Warner show that Plaintiff was induced to sign the severance agreement by false representations of the contents of the severance agreement. *Id.* Plaintiff contends that fraudulent inducement voids the release completely. *Id.* at 20.

Under California law, extrinsic evidence is admissible to establish fraud and to

challenge the validity of a contract.  Cal. Code Civ. Pro. § 1856(f)-(g); *see also Jefferson*, 28 Cal. 4th at 305.   While oral promises that contradict the contents of the contract are inadmissible, statements of fact about the *contents* of the contract are admissible under the fraud exception.  *See Pacific State Bank v. Greene*, 110 Cal. App. 4th 375, 392 (2003).  If a contract was signed as the result of false statements about its contents ("fraud in the inducement"), it is voidable. *Id.* at 387-88, 389 n. 7.  A reasonable jury could find that Defendant Scott's and Warner's statements about the contents of the contract misrepresented the facts and constitute fraud in the inducement, which would prevent Defendants from enforcing the release against Plaintiff as to any of his claims.

Summary Judgment is denied as to Plaintiff's first claim for recision of the severance agreement and his second claim for declaratory relief that the severance agreement did not waive Plaintiff's claims.

## II.      Equipment Agreement

Defendants contend that the parties negotiated about a possible deal to allow Plaintiff to retain equipment in the San Diego laboratory, but that no agreement was ever reached, much less reduced to writing.  (Doc. # 24 at 15).  Defendants contend that even if there was an oral contract, Plaintiff's claims relating to the equipment are barred by the Statute of Frauds.  *Id.* at 18.   Defendants contend that the subsequent negotiations after Plaintiff asserts a contract was formed shows that there was no "meeting of the minds on all material points," which "prevents the formation of a contract *even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract*." *Bustamante v. Intuit*, 141 Cal. App. 4th 199, 215 (1998) (citation omitted).    Defendants assert "there is no evidence of outward manifestations of mutual assent," and therefore, no contract formation. *Id*.; (Doc. # 24 at 15).  Further, Defendants assert Plaintiff "did not undertake any additional performance on Iverness's behalf" because Plaintiff was already compensated for his work by his salary. *Id.* at 18-19.

Plaintiff contends that there was an oral agreement that was memorialized in writing by Plaintiff's meeting minutes, the email responses of Iverness's employees to Plaintiff's meeting

1   minutes, and the September 12, 2005 email from Anne Warner. (Doc. # 32 at 8).   The

2   negotiations that occurred after these emails were "simply discussions between [Plaintiff] and

3   Iverness for possible future contracts between them." *Id.* at 9.   Plaintiff asserts that Iverness

4   only began to attempt to alter the agreement after Plaintiff had fully performed. *Id.*   However,

5   Plaintiff also contends that even if the writing does not suffice to satisfy the Statute of Frauds,

6   Plaintiff's full performance of his obligations and Defendants acceptance of the reagents is an

7   exception to the Statute of Frauds. *Id.* at 12.   Further, even if this exception does not apply,

8   Plaintiff contends that Defendants are estopped from asserting the Statute of Frauds because

9   they induced Plaintiff to perform his part of the deal by their promises. *Id.* at 14-15.

10        Contract terms must be sufficiently definite for the contract to be enforced. *Bustamante*,

11   141 Cal. App. 4th at 211-12.   Plaintiff has come forward with evidence including meeting

12   minutes and emails that memorialize an oral agreement between Plaintiff and Defendant

13   Iverness for delivery of certain reagents by October 31, 2005 in exchange for all of the

14   equipment in the San Diego laboratory except for the Genicon and the Malvern Particle Sizer.

15   (Doc. 24, Ex. 5, at 93-100).   Plaintiff has set forth evidence of terms which make clear what

16   each party was required to do and a date by which the parties were required to perform.

17   Taking Plaintiff's evidence in the light most favorable to him, these terms are sufficiently

18   definite to form an enforceable contract. *See* Cal. Civ Code § 1550, *Weddington Productions*

19   *v. Flick*, 60 Cal. App. 4th 793, 811 (1998) ("In order for acceptance of a proposal to result in

20   the formation of a contract, the proposal must be sufficiently definite, or must call for such

21   definite terms in the acceptance, that the performance promised is reasonably certain.")

22   (citation omitted).   Although it is undisputed that negotiations continued about the potential

23   ongoing relationship between the company Plaintiff proposed to form and Defendant Iverness,

24   Plaintiff contends these were negotiations for a separate contract.   Plaintiff's testimony about

25   Defendants' oral agreement to exchange the equipment in return for the production of the

26   reagent and the emails from Defendant Iverness's employees referencing this deal are evidence

27   of "outward manifestations of mutual assent" that could convince a jury that Defendants agreed

28   to be bound.   Unless enforcement of the contract is barred by the Statute of Frauds, the

statements of and emails from Defendant Iverness's employees raise a genuine issue of material fact as to whether an enforceable contract was formed.

Defendants cite Commercial Code § 2201, which bars enforcement of a contract for a sale of goods valued at more than $500 unless there is a writing "signed by the party against whom enforcement is sought." However, Plaintiff states in his deposition and his declaration that he delivered the reagents to Defendants and Defendants accepted them. (Doc. # 32-3, Manneh Declaration at 9, ¶ 28). Commercial Code § 2201(3)(c) states that an oral contract is enforceable "with respect to goods . . . which have been received and accepted." Plaintiff's statement that Defendants received and accepted the reagents prevents the enforcement of the Statute of Frauds at the summary judgment stage.

In the fourth claim common count, Plaintiff seeks compensation for services performed by Plaintiff for Defendants' benefit at Defendants' request. *See Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 460 (1997) (the elements of a common count are "(1) indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment") (citation omitted). Defendants contend that Plaintiff was already compensated by his salary for the work he performed and "there is no evidence of any agreement between Plaintiff and Iverness that he would be paid "extra" for his services or even the amount that his "extra" services would be valued." (Doc. # 24 at 19). However, Plaintiff's statements and the emails between Defendant Scott, Defendant Iverness's employees, and Plaintiff are evidence of an agreement to separately compensate Plaintiff for creating the reagents. (Doc. 24, Ex. 5, at 93-100). In addition to the evidence of a separate agreement, the original employment agreement contains evidence that Plaintiff was not compensated for the work of creating the reagents. Plaintiff's contract states that he was expected to work "37.5 hours per week, Monday to Friday with a ½ hour for lunch." (Doc. # 24, Ex 4, Employment Agreement at 81). Plaintiff states in his declaration that he was working approximately 70 hours a week for a three-month period to complete the reagents. (Doc. # 32-3, Manneh Declaration at 9, ¶ 27). Although the employment agreement stated that Plaintiff "may be expected to work additional hours as required by the Company" (Doc. # 24, Ex 4, Employment Agreement at 81), a jury

1   could find that the employment agreement did not require Plaintiff to work 70 hours a week

2   for three months without additional compensation.

3       Plaintiff has stated he is owed $500,000 for the value of his services, which  is based

4   on Defendant Iverness's own assessment of the value of the equipment in the San Diego

5   laboratory.  (Doc. # 32-4, Plaintiff's Answers to Special Interrogatories, at 46, ¶1a).  Plaintiff

6   has brought forth sufficient evidence that a jury could find in his favor on a common count.

7       Summary Judgment is denied as to Plaintiff's third claim for breach of the equipment

8   agreement and Plaintiff's fourth claim for common count for services rendered.

9   **III.    Misrepresentation as to Stock Option Vesting**

10      Defendants contend Plaintiff's claims for intentional misrepresentation and negligent

11  misrepresentation regarding the vesting period for stock options fail as a matter of law.  (Doc.

12  # 24 at 20).  Defendants contend that there was no misrepresentation of any material fact,

13  simply a mistake in Plaintiff's employment agreement. *Id.*  Defendants contend the additional

14  5000 shares granted to Plaintiff in the spring of 2003 constitute consideration for a novation

15  of the original employment contract changing the vesting period from three years to four years.

16  *Id.*  As to the negligent misrepresentation claim, Defendants contend that Plaintiff has failed

17  to offer evidence of a duty between himself and Defendants, which is fatal to his claim.  *Id.*

18  Plaintiff asserts that the statement that it was not possible to give him a three-year vesting

19  period and Defendant Scott would correct the problem fraudulently induced him to sign the

20  subsequent four-year vesting agreements. (Doc. # 32 at 23).

21      Novation is the substitution of a obligation for an existing obligation "with intent to

22  extinguish the latter." *Klepper v. Hoover,* 21 Cal. App. 3d 460, 463 (1971); Cal. Civ. Code

23  § 1530.  The burden of proving novation is on the party asserting it.  *See Howard v. County*

24  *of Amador*, 220 Cal. App. 3d 962, 980 (1990).   "A novation is subject to the general rules

25  governing contracts and requires an intent to discharge the old contract, mutual assent, and a

26  consideration." *Klepper*, 21 Cal. App. 3d at 463.  "When there is conflicting evidence the

27  question whether the parties to an agreement entered into a modification or a novation is a

28  question of fact." *Howard*, 220 Cal. App. 3d at 962.

1    Defendant has offered no evidence that the additional 5000 shares were consideration

2    for a novation.  The second grant of stock options does not state that it is consideration for a

3    novation of the three year vesting term in the employment agreement.  (Doc. 24, Ex. 12). The

4    second set of stock options were granted two months after Plaintiff signed the stock option

5    agreement with the four-year vesting term.  *Id*.  Plaintiff states that the second agreement for

6    5000 shares was a "performance bonus" he received because he "had introduced to Iverness

7    several technologies for developing high sensitivity protein assays." (Doc. # 32-3, Manneh

8    Declaration at 3, ¶ 9).  The Court concludes that the issue of whether the second set of stock

9    options were consideration for a novation cannot be resolved at the summary judgment stage.[4]

10   Whether the second set of stock options awarded in 2003 were consideration for a

11   novation of the original stock options contract is irrelevant to Plaintiff's claims for

12   misrepresentation.  Plaintiff states he learned of the misrepresentation in 2007 when he

13   examined the compensation plan for executive officers on Iverness's website (Doc. # 32-3,

14   Manneh Declaration, p. 13-14, ¶ 40).  Even if Defendants could establish novation,  Plaintiff

15   states he did not know of that misrepresentation until well after he signed the agreement for

16   the additional 5000 shares.  Novation would not defeat Plaintiff's misrepresentation claims.

17   Defendants, citing *Eddy v. Sharp*, 199 Cal. App. 3d 858, 864 (1988), contend that

18   Plaintiff "fails to allege in the Complaint or during discovery any duty between himself and

19   any other person or entity," which would be fatal to Plaintiff's claim.  However, *Eddy v. Sharp*

20   holds that as a matter of law, a party to a "business transaction" is under a legal duty not to

21   misrepresent facts to the other party, and has a duty to disclose facts related to the transaction

22   "if he knows that the other [party] is about to enter [the transaction] under a mistake" as to

23   those facts.  199 Cal. App 3d at 864 (citing Rest. 2d Torts § 551 (2)(e)).  Plaintiff has offered

24   evidence that he engaged in a business transaction with Defendants and that Defendants

25   affirmatively misrepresented their company policy.

26   Summary Judgment is denied as to Plaintiff's fifth cause of action for intentional

27

28

---

[4]Defendants do not contend that summary judgment should be granted on Plaintiff's seventh claim for breach of the employment contract as to the stock options.  However, the factual dispute about novation would bar summary judgment as to this claim as well.

misrepresentation, his sixth cause of action for negligent misrepresentation, and his seventh cause of action for breach of the employment agreement as to the stock options.

**IV.   Interference with Economic Advantage**

Plaintiff states a claim for interference with prospective economic relations claims based on two factual grounds: (1) failing to name him as an inventor on a patent application, and (2) a business opportunity he lost because he did not have the equipment from the San Diego laboratory necessary to perform the proposed work. (Doc. # 1 at 24-25).   Defendants contend that Plaintiff has failed to allege or offer any evidence that the failure to name Plaintiff as an inventor on patents resulted in the disruption of a business relationship with a third party and Plaintiff's damages are too speculative.   Defendants further contend that Plaintiff has failed to allege that Defendants knew of the potential business opportunity.   Plaintiff states he has presented evidence that provides a concrete calculation of his lost profits due to Defendants' interference with his prospective economic advantage. *Id.* at 24.

> The five elements for intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Youst v. Longo*, 43 Cal. 3d 64, 71 (1987).   To recover damages on any contracts claim in California, a plaintiff must prove that the damages compensate for "claimed benefits [which were] reasonably certain to have been realized but for the wrongful act of the opposing party." *Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 989 (2001).   "Whatever its measure in a given case, it is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.'" *Id.* (citing *Frustruck v. City of Fairfax*, 212 Cal. App. 2d 345, 367-68 (1963)).

Plaintiff has not offered any evidence of an economic relationship or prospective economic relationship which was damaged by Defendants failure to name him as an inventor on patents.   Plaintiff also fails to assert any specific damages that resulted from Defendants'

failure to name him on the patent. Although Plaintiff claims he has presented "admissible evidence showing the damages he sustained" from Iverness's failure to name him as an inventor of the assay device, he does not identify that evidence in his opposition.[5] *See* Doc. 32 at 24. Nothing in the record appears to address damages resulting from failure to name Plaintiff on the patent.

As for Plaintiff's claim that he lost a potential contract with a third party because of Defendants failure to turn over the equipment, Plaintiff does not offer any evidence that Defendants were aware of this relationship.

Summary judgment is therefore granted as to Plaintiff's eighth claim for interference with prospective economic advantage claims.

## V.     Evidentiary Objections

Defendants filed fifty evidentiary objections with their reply (Doc. # 33-2). All objections to evidentiary materials cited in this Order are overruled. All objections to evidentiary materials not cited in this Order are denied as moot.

### CONCLUSION

IT IS HEREBY ORDERED that Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's seventh claim for breach of the employment contract as to the patent for the assay device and eighth claim for interference with prospective economic advantage and otherwise **DENIED**.

DATED:  December 1, 2009

*William Q. Hayes*

**WILLIAM Q. HAYES**
United States District Judge

---

[5] Plaintiff's claim for breach of the employment contract as to the patents also cannot survive summary judgment because he has failed to identify any evidence about damages.